**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

   v.

ZENERGY INTERNATIONAL, INC.,
BOSKO R. GASICH,
ROBERT J. LUITEN,
SCOTT H. WILDING,
SKYLINE CAPITAL, INC.,
RONALD MARTINO, and
DIANE D. DALMY,

       Defendants,

  and

MARKET IDEAS, INC.,

       Relief Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

**NATURE OF THE ACTION**

1.    This matter involves a pump-and-dump scheme orchestrated by Defendant Bosko R. Gasich ("Gasich"), one of the founders and principal shareholders of Defendant Zenergy International, Inc. ("Zenergy"). Zenergy is a company headquartered in Chicago, Illinois that purported to be in the business of selling and producing biofuels. Zenergy's stock is quoted on the over-the-counter market.

1

2.      In June 2009, Gasich caused Zenergy to enter into a reverse merger with Paradigm Tactical Products, Inc. ("Paradigm"), a publicly traded shell entity.  Shortly before the merger, Gasich prepared a backdated convertible note for a $30,000 debt purportedly owed to him by Zenergy.  Paradigm agreed to assume this debt and to issue shares of its common stock to settle the debt as partial consideration for the reverse merger.

3.      Gasich then assigned this purported debt to his family and friends, Nenad Jovanovich ("Jovanovich"), Kymberly A. Nelson ("Nelson"), Javorka L. Gasic ("J. Gasic"), and Diana Bozovic ("Bozovic"); stock promoters, including Defendant Scott H. Wilding ("Wilding"); associates of Paradigm; and counsel, Defendant Diane D. Dalmy ("Dalmy"); and caused Paradigm to issue 300 million shares of purportedly unrestricted stock to these assignees.

4.      Dalmy, who served as transaction counsel for the reverse merger and sold shares herself, issued opinion letters to transfer agents and others that improperly concluded that these shares were unrestricted and could be sold immediately.

5.      Thereafter, Gasich and the promoters conducted two promotional campaigns to generate investor interest in Zenergy.  The campaigns used misleading press releases and financial disclosures reviewed and approved by Gasich and Zenergy's Chief Executive Officer, Defendant Robert J. Luiten ("Luiten"), and touts by individuals who failed to disclose the compensation received for promoting Zenergy stock, including Dale J. Baeten ("Baeten"), Charles C. Bennett ("Bennett"), George E. Bowker, III ("Bowker"), and Defendant Ronald Martino ("Martino").  The promotional activity induced members of the investing public to buy Zenergy stock and increased Zenergy's share price.

6.      Gasich, his assignees, and their associates then sold their shares into the public market for illicit trading profits totaling at least $4.4 million.

2

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Section 20(b) and 20(d) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

8.      This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and

28 U.S.C. § 1331.

9.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Acts, practices, and

courses of business constituting violations alleged herein have occurred within the jurisdiction of

the United States District Court for the Northern District of Illinois and elsewhere.  Moreover,

certain defendants reside or transact business in this district.

10.      Defendants, directly and indirectly, have made use of the means and

instrumentalities of interstate commerce and of the mails in connection with the acts, practices,

and courses of business alleged herein.

## DEFENDANTS

### Issuer and Affiliates

11.      **Zenergy International, Inc.** was incorporated in Nevada on July 31, 2006 and

identifies Chicago, Illinois as its headquarters.  Zenergy purported to be in the business of selling

and producing biofuels.  Zenergy was formed by Luiten, Gasich, and Gasich's now-deceased

business partner ("Gasich's Partner").  In June 2009, Zenergy combined with a shell entity,

Paradigm Tactical Products, Inc., which was quoted on OTC Link (formerly, the Pink Sheets)

operated by the OTC Markets Group, Inc. ("OTC Markets") and purportedly sold handheld

metal detectors to law enforcement and security companies.  From its inception to the present,

Zenergy has not had any significant operations or assets. Currently, Zenergy is not operational, and its corporate registration has been revoked. Neither Zenergy nor its securities are or were registered with the Commission in any capacity.

12. **Bosko R. Gasich**, age 45, resides in Chicago, Illinois. Gasich was a founder and principal shareholder of Zenergy. Gasich also acted through Lone Star Strategic Partners, LLC ("Lone Star"), Market Ideas, Inc., The Spire Group, LLC ("Spire Group"), Karma Group Holdings, LLC, and Vertical Group Holdings, LLC ("Vertical Group"), which were owned or controlled by him. From 1991 to 2000, Gasich was a registered representative, successively associated with four registered broker-dealers. Gasich held Series 7 and Series 63 licenses. Through his firm, Market Ideas, Gasich has been involved with several other penny stock companies, assisting with reverse mergers, unregistered financings, and investor relations.

13. **Robert J. Luiten**, age 47, resides in Mobile, Alabama. Luiten was a founder and principal owner of Zenergy and, from July 31, 2006 through at least 2010, its Chief Executive Officer ("CEO"), Chairman of the Board, and sole director.

**Promoters and Touters**

14. **Scott H. Wilding**, age 51, resides in Pembroke Pines, Florida. Wilding was a stock promoter and acted as an intermediary between companies seeking to raise capital and shell entities. On February 17, 2004, the Commission ordered Wilding to cease and desist from violating Sections 5(a) and (c) of the Securities Act.

15. **Skyline Capital, Inc.** ("Skyline Capital") was incorporated by Wilding in Florida on January 8, 2004 and is based in Pembroke Pines, Florida. Wilding formed Skyline Capital a month prior to the cease-and-desist order issued against him in February 2004.

16. **Ronald Martino**, age 50, resides in Cranston, Rhode Island.

4

### Counsel

17.  **Diane D. Dalmy**, age 58, resides in Denver, Colorado.  Dalmy served as counsel for the reverse merger and issued opinion letters that improperly concluded that her shares and the shares of many of the above individuals and entities were unrestricted and freely tradable. She has served as counsel to multiple microcap issuers.  On September 24, 2009, OTC Markets placed Dalmy on its prohibited attorney list.

### Relief Defendant

18.  **Market Ideas, Inc.** ("Market Ideas"), based in Chicago, Illinois, was incorporated by Gasich, its sole owner, in Delaware on June 1, 2005.

### FACTS

### Formation of Zenergy and Pre-Merger Activity

19.  From its formation in July 2006 to the time of the reverse merger with Paradigm in June 2009, Zenergy purported to operate as a biofuel production and trading company.

20.  Zenergy was founded by Gasich, Gasich's Partner, and Luiten.  Luiten, a former biofuels executive, was Zenergy's Chairman and CEO and managed its day-to-day operations. However, Gasich and Gasich's Partner participated in the management of Zenergy as controlling shareholders and pursuant to consulting agreements.

21.  Although Luiten possessed authority over Zenergy as the CEO and Chairman of the Board, he shared control of the entity with Gasich.  After Gasich's Partner passed away, Luiten and Gasich, who were the original founders and principals of Zenergy, were the only two individuals operating Zenergy.  Zenergy did not hold formal board meetings or observe other corporate formalities.  Instead, Luiten and Gasich informally shared decision-making.

22.  Zenergy had no revenue or income, nor any assets of consequence.  It initially was financed through capital contributions by Gasich and Gasich's Partner in 2006 and

convertible debt from a handful of other investors during 2007 and 2008. The vast majority of these funds were used to pay Luiten's salary and Gasich and Gasich's Partner's consulting fees.

23. Zenergy unsuccessfully attempted to raise capital through bank loans and, from December 2006 through February 2008, through a failed offering pursuant to Regulation A under the Securities Act [17 C.F.R. § 230.251].

## The Paradigm Reverse Merger

24. In late 2008, Zenergy resolved to combine with a publicly traded shell entity to access publicly traded stock. In early 2009, Gasich identified Paradigm for this purpose.

25. At the time, Paradigm purported to be in the unrelated business of selling handheld metal detectors and had no operations or assets. For years, Paradigm's shares, which were quoted on OTC Link, were thinly traded at a price well below a penny per share.

26. Zenergy and Paradigm entered into a memorandum of understanding regarding a potential share exchange transaction on March 31, 2009. Gasich negotiated the transaction on behalf of Zenergy, and Wilding negotiated on behalf of Paradigm. The initial agreement was approved by Luiten, a former owner and officer of Paradigm ("Paradigm Associate A"), and the CEO of Paradigm ("Paradigm Associate B"). Dalmy served as transaction counsel for the reverse merger.

27. In her capacity as transaction counsel, Dalmy supplied the documents and legal structure necessary to consummate the merger and allow Zenergy access to publicly traded shares.

28. In connection with this process, she received emails prior to the transaction from Gasich, Wilding, and others reflecting the need to obtain convertible debt necessary to convey freely trading shares to the transaction participants, referring to control over the float, and alluding to an impending distribution of shares.

6

29.     Dalmy also knew that Wilding, a promoter who was subject to a Commission cease-and-desist order for his prior participation in unregistered offerings, was significantly involved in the negotiation of the reverse merger.

30.     Immediately prior to the transaction, with Dalmy's assistance, Paradigm Associate B issued himself a control block of approximately 400 million shares so that Paradigm could obtain shareholder approval for the reverse merger.  Paradigm Associate B then executed various documents, which were prepared by Dalmy, to approve the transaction on behalf of Paradigm.

31.     On or about May 28, 2009, Zenergy and Paradigm entered into a share exchange agreement, pursuant to which Zenergy would be merged into Paradigm.  Each company approved the share exchange agreement on or about June 8 and 9, 2009.

32.     Through this "reverse merger," Zenergy's shareholders assumed control of Paradigm.  After reducing the number of its outstanding shares from 1.5 billion to 20 million through a reverse stock split, on June 12, 2009, Paradigm issued seven new Paradigm shares to existing Zenergy holders for each share of Zenergy held by them.  In the aggregate, Zenergy shareholders received 216,232,100 restricted shares and a 91.5 percent stake in Paradigm.  Based on their holdings in Zenergy at the time, Luiten, Gasich's Partner's widow, and Gasich, through the Spire Group, received almost all of these shares.  Luiten, Gasich's Partner's widow, and Gasich each held 28 percent of the combined entity.

33.     Shortly after the transaction, in July 2009, Paradigm was renamed Zenergy, and the Paradigm ticker symbol ("PDGT") was replaced with the Zenergy symbol ("ZENG").

## The Gasich Assignment

34.     In connection with the reverse merger, Gasich, together with Wilding and Paradigm Associates A and B, planned to distribute 300 million shares of purportedly

7

unrestricted stock to family and friends of Gasich, promoters and touters, and associates of Paradigm.

35.     As partial consideration for the merger, Paradigm would assume $30,000 of convertible debt purportedly owed by Zenergy.

36.     Gasich then would assign portions of the debt to be converted by the assignees into shares to be sold in connection with a promotional campaign.

37.     To effectuate the distribution of these shares, Gasich prepared a backdated convertible note.  On May 17, 2009, pursuant to Gasich's request, Dalmy sent Gasich a template for a "standard convertible note."  On May 26, 2009, Gasich sent Luiten, for Luiten's signature, a note dated April 17, 2008 that tracked Dalmy's template.  Gasich returned an executed note that followed Dalmy's template to Dalmy on May 27, 2009.  The underlying "debt" never existed.  Moreover, Gasich did not provide any consideration to obtain the convertible feature.

38.     The note's stated conversion rate, which differed from all other convertible notes issued by Zenergy, permitted the conversion of the purported debt into 300 million shares.

39.     Days after the share exchange agreement was signed, Gasich assigned portions of the convertible debt to his family and friends, promoters, associates of Paradigm, and Dalmy, all of whom immediately exercised the option to convert the debt into shares of Paradigm stock.

40.     From June 19 to 23, 2009, Paradigm, Zenergy's predecessor entity, issued 300 million shares to Gasich's assignees in the following manner:

        (a)     Paradigm issued 196 million shares to Gasich's family and friends,

                  including: Jovanovich, a close friend and college roommate, to raise capital

                  for Zenergy; Nelson, Gasich's then-fiancée, to hold and sell on Gasich's

                  behalf; J. Gasic, his sister, to compensate owners of a company to be

acquired by Zenergy after the reverse merger; and Bozovic, Gasich's niece, to finance touting activity and to transfer to Nelson (on Gasich's behalf). Although the assignments to friends and family purportedly were based on consulting services, none of these assignees provided any significant services to Zenergy, and all acted as nominees for Gasich. Combining these 196 million shares with his own holdings, Gasich effectively controlled 49 percent of the 536 million shares outstanding.

(b)     Paradigm also issued 38 million shares to Wilding (through Skyline Capital), who would coordinate and finance Zenergy's promotional activity and transfer Zenergy stock to touters. Wilding purportedly received his shares as consideration for negotiating the merger and to satisfy alleged debts owed to him by Paradigm before the merger. Paradigm issued an additional 10 million shares to another individual (through one of his entities) who would promote Zenergy through a website controlled by him ("Website Owner").

(c)     Fifty-two million shares were issued to former associates of Paradigm. Paradigm Associate A's entity (which was nominally controlled by Paradigm Associate C) and Paradigm Associate B (in part through his personal entity) each received 26 million shares.

(d)     Dalmy received 4 million shares as counsel for the transaction.

41.     After the Gasich assignment, Gasich and several of his assignees (including Paradigm Associates A and B, Jovanovich, and Nelson) opened personal and corporate accounts

with the same broker-dealer, where they deposited the shares received through the assignment. Most of these individuals began selling shares immediately.

42.     The heaviest sale volume by this group occurred in connection with the promotional activity that peaked in August 2009, which is described below.

43.     In September 2009, after the broker-dealer's clearing firm refused to continue clearing trades in Zenergy, these individuals moved their accounts to other broker-dealers and, together with other Gasich assignees and their transferees, continued to sell through a second promotional wave that began in September 2009 and crested in December 2009.

44.     Over both time periods, the assignees and their immediate transferees amassed at least $4.4 million in trading profits.

**Promotional Activity**

45.     Gasich orchestrated a promotional campaign to inflate the price of Zenergy stock that combined false and misleading disclosures with touting activity.

46.     The promotional activity can be divided into two phases: (1) from April 2009 to September 2009 and (2) from September 2009 to December 2009.

**Promotional Activity from April 2009 to September 2009**

47.     From June 2009 to August 2009, Zenergy and Paradigm issued a number of press releases designed to generate interest in Zenergy securities.

48.     These press releases were initiated by Gasich, who reviewed, edited, approved, and distributed them.  Luiten also reviewed and approved all or nearly all of the press releases.

49.     In several of these press releases, Zenergy, Gasich, and Luiten misrepresented or omitted material facts about Zenergy's assets and operations and the reverse merger.

*Press Releases Issued in June 2009*

50. Zenergy, under its former name, Paradigm, issued two misleading releases about the reverse merger in June 2009.

51. On June 5, 2009, Paradigm announced that it was finalizing a definitive agreement to acquire an unidentified "rapidly emerging" biofuel company.

52. On June 23, 2009, Paradigm announced the completion of a reverse merger with Zenergy and the appointment of Luiten as CEO. According to the June 23, 2009 release, Zenergy was an "innovative biofuel solutions provider positioned to effectively capitalize on the emerging biofuels market while simultaneously bringing the opportunity to the public for participation in strong potential corporate growth."

53. These two releases failed to disclose that Zenergy's operations and assets were nonexistent.

54. Neither press release disclosed the material terms of the reverse merger, the Gasich assignment, or the related share issuances.

55. Zenergy and Paradigm also failed to disclose in the press releases that the agreement between Paradigm and Zenergy included, among other things, Paradigm's assumption of $30,000 of convertible debt purportedly owed by Zenergy to Gasich. The releases also misleadingly omitted the assignment of convertible debt to Gasich's family and friends, promoters and touters, Paradigm's associates, and counsel to distribute 300 million shares to the investing public.

56. The omissions were material because they concealed from investors significant aspects of the transaction and the existence of an impending distribution and promotion of Zenergy's stock.

57. Moreover, the releases were materially false and misleading because Paradigm and Zenergy already had executed the share exchange agreement at least one week before the June 5, 2009 announcement.

58. The omitted facts regarding the lack of operations and assets, the material terms of the reverse merger, the Gasich assignment, and the related share issuances were material because reasonable investors would have considered them important to the evaluation of an investment in Zenergy.

59. By delaying the reporting of the transaction, Gasich gained additional time to organize promotional activity and the sale of shares into the market. In addition, because the June 5, 2009 press release inaccurately described the agreement as indefinite, when in fact an agreement had been reached, Zenergy was able to issue multiple releases concerning the transaction, in a manner designed to inflate interest in Zenergy's securities artificially.

60. Zenergy, Gasich, and Luiten knew or were reckless in not knowing that these statements and omissions in the June 2009 press releases were materially false and misleading when made. Among other things, both Gasich and Luiten knew about the material terms of the share exchange agreement and reverse merger, the impending distribution of shares to the public, and Zenergy's lack of operations and assets. At the time of the press releases, Gasich also knew about the coming promotion of Zenergy stock for which he organized the promotional activity.

### Press Releases Issued in August 2009

61. Zenergy issued additional press releases designed to inflate Zenergy's share price in August 2009.

62. On August 3, 2009, Zenergy announced the changing of the corporate name to Zenergy and its intention to reduce authorized shares from 1.5 billion to 700 million.

63.     On August 11, 2009, Zenergy announced the share reduction, representing that the restructuring would permit Zenergy to begin negotiating with possible acquisition candidates and joint ventures.

64.     Although technically accurate, the August 3 and 11, 2009 releases were issued primarily to attract attention to Zenergy and fuel speculation of merger and acquisition activity.

65.     On August 7, 2009, Zenergy announced that a purported recognized authority on green technologies had been appointed to its Board of Advisors.

66.     However, the August 7, 2009 press release failed to disclose that the Board of Advisors was a board of one or that this individual had been involved with Zenergy since its formation, a fact known to both Gasich and Luiten.  This press release falsely gave investors the appearance that the company actually maintained a functioning board of advisors, when in fact it did not.

67.     Based on his role in organizing the promotional activity, Gasich understood that the August 2009 press releases were being issued in conjunction with a promotion of Zenergy's stock to generate artificial interest in Zenergy's stock.

68.     Luiten knew or was reckless in not knowing that the August 2009 press releases were designed to inflate Zenergy's share price because, among other things, several releases were issued in rapid succession around the time of the reverse merger and repeated previously issued disclosures or dated information.

### Coordinated Touting Activity

69.     During the period that Zenergy issued these press releases, Gasich and Wilding coordinated a promotional campaign through touters.

70.     While the reverse merger was being negotiated and consummated in May 2009, Wilding retained Baeten, Bennett, and Website Owner to tout Zenergy securities following the

merger.  On or about July 8, 2009, Wilding hired and promised compensation of 1 million shares to another touter, Bowker.  Although Wilding failed to deliver these shares, Wilding sent $8,000 to Bowker on August 1 and 6, 2009.  On August 7, 2009, Wilding transferred a total of 11 million shares to compensate Baeten (3 million), Bennett (2 million), and Website Owner (6 million) for touting Zenergy.  On August 30, 2009, Wilding transferred $15,000 to a fifth touter, Martino.

71.     Baeten, Bennett, Bowker, Martino, and Website Owner touted Zenergy without disclosing their actual or expected compensation.

72.     Further, Baeten, Bennett, and Website Owner sold shares received from Wilding during the period that they were promoting Zenergy.

73.     Gasich and Wilding guided the touting activity, directing the transmission of email, message board posts, and Twitter messages to the public in a coordinated manner and supplying information for the promotional activity.

74.     For instance, on May 12, 2009, Wilding instructed Bennett to "post your f***ing a** off when the time comes."

75.     Personally and through his entities, Investing in Stock Market, Inc. and Midwest Stock Consulting, Inc., Baeten began promoting Zenergy stock on message boards and through his email newsletter in June 2009.  For example, on July 31, 2009, Baeten emailed his listserves that "ZENG, formerly PTPC, [is] just getting started; next week is going to be so much fun."

76.     From June through December 2009, Bennett posted comments about Zenergy on message boards, and served as moderator for the Zenergy message board on a public investor website, and Bowker acted similarly.  For instance, on July 11, 2009, Bowker publicly traded messages with Bennett, writing that he was "just very confident this is monster, in the right

sector, with the right team." On July 27, 2009, Bowker published a statement on a public investor website that "I truly believe we have a gem here. I have a feeling Zenergy will be one of those stocks you look at that's 20 cents, and [you] wish you got in when it was 3 cents."

77.     On August 4 and 5, 2009, Gasich, Wilding, and Website Owner coordinated Twitter, web, and email promotion of Zenergy in conjunction with the issuance of the August 3 and August 11, 2009 press releases. On August 4, 2009, Wilding emailed Bowker that Website Owner's promotion would occur that weekend. In response, Bowker replied "good, I've been pumping this for 5 weeks now."

78.     On August 8, 2009, Zenergy's stock was promoted on Website Owner's website, and on August 13, 2009, Zenergy was the subject of an investment report that repeated the information previously released by Zenergy.

79.     The first phase of promotional activity peaked in early August 2009.

80.     As a result of the first wave of promotional activity and press releases, Zenergy's share price increased dramatically. Prior to June 2009, Paradigm stock was trading at less than a penny per share on minimal volume. After rising to $0.06 per share the day after the merger announcement, Paradigm's stock price fell to $0.02 per share by July 22, 2009. As a result of the promotional activity in August 2009, Zenergy's stock price (following the substitution of Zenergy's ticker symbol for Paradigm's symbol) again began to climb from this low point to its peak of $0.10 per share on August 10, 2009 on volume of 23 million shares.

**Promotional Activity from September 2009 to December 2009**

81.     In early September 2009, OTC Markets (formerly Pink OTC Markets Group, Inc.) identified Zenergy's securities with a caveat emptor label and blocked quotations of Zenergy until Zenergy submitted a disclosure statement containing information about its ownership, operations, and financial condition.

15

*Postings to the OTC Markets Website*

82.     On or about September 15, 2009, Zenergy posted to the OTC Markets website an information and disclosure statement (the "Statement").

83.     The Statement was drafted, reviewed, and approved by Luiten and Gasich.

84.     Zenergy's Statement contained numerous misstatements and omissions.

85.     Among other things, Zenergy failed to disclose material facts about the reverse merger, such as the issuance of shares to Zenergy stockholders, Gasich's assignment, and the issuance of shares to former associates of Paradigm.

86.     By omitting these material terms, Zenergy concealed the distribution and promotion of Zenergy's stock.  The omitted information would have been important to investors evaluating an investment in Zenergy securities.

87.     Zenergy also misrepresented or omitted to disclose material information about the control of Zenergy.

    (a)     For example, Zenergy failed to identify Gasich, his affiliates, and his nominees as control persons in a section of the document purporting to identify all control persons.

    (b)     Similarly, in a section of the document purporting to list all beneficial owners of 5 percent or more, Zenergy failed to identify multiple individuals or entities holding that amount, including Jovanovich (9 percent), Nelson (9 percent), Bozovic (9 percent), Wilding (7 percent), and Paradigm Associate B (6 percent).

    (c)     Zenergy also failed to disclose that the Spire Group was controlled by Gasich or that Gasich controlled shares held by his family members, fiancée, and college friend.

16

     (d)     Zenergy falsely reported that "there [were] no relationships existing among and between the issuer's officers, directors, and shareholders."

88.     Individually and collectively, the misleading statements and omissions relating to the control of Zenergy concealed from investors Gasich's control of the entity, a distribution of stock to a small number of associated individuals, and the participation of promoters.

89.     Zenergy also misrepresented or omitted to disclose material information about the operations and assets of Zenergy.

     (a)     Zenergy represented that the company had five employees, when in reality Zenergy had no full-time employees.

     (b)     Zenergy identified an individual as the Chief Financial Officer, without specifying that this person had worked only as a part-time bookkeeper since early 2009.

     (c)     Further, Zenergy affirmatively disclaimed shell company status, even though both Paradigm and Zenergy lacked operations and assets other than cash.

     (d)     The Statement also did not include Zenergy's financial information, which would have reflected the lack of operating history and assets, as well as other information necessary for an evaluation of an investment in Zenergy.

90.     Individually and collectively, these material misrepresentations and omissions about Zenergy's management and operations falsely presented Zenergy as an operating business enterprise and concealed from investors its lack of activity, operations, and assets.

91.     Because the Statement did not contain any financial statements, OTC Markets refused to change or remove the caveat emptor label.

92. On or about October 21, 2009, Zenergy posted financial statements dated September 30, 2009 as a supplement to the Statement.

93. These financial statements were prepared and approved by Gasich and Luiten.

94. The financial statements contained several materially false statements and omissions.

95. Among other things, Zenergy inaccurately and falsely described a purported outside investment by a third party.

(a) The notes to the financial statements falsely stated that Zenergy had received $570,000 as a result of a direct investment from a third-party investor in exchange for 3.8 million shares.

(b) This purported "third party investment" was in reality a $550,000 transfer of funds from Gasich's college roommate, Jovanovich, generated by selling shares that Jovanovich received through the Gasich assignment.

(c) Jovanovich made this $550,000 transfer at Gasich's direction, and Jovanovich did not receive any shares in return. The remaining $20,000 was not an investment at all, but represented Gasich's supposed waiver of accrued consulting fees purportedly owed to him.

(d) Zenergy also inaccurately represented that it had 540,032,195 outstanding shares when, in fact, it had only 536,232,195—3.8 million shares less than stated. This overstatement created the illusion that the "third-party investor" paid $0.15 per share for the 3.8 million shares, which greatly exceeded the $0.03 market price.

96.     A reasonable investor would have considered these facts and the true source and reason for the purported third-party investment significant to the decision to purchase or sell Zenergy securities.  Investors also would have wanted to know that the shares were presented at an artificially high value.

97.     Zenergy's financial statements also falsely listed two purported loans to Zenergy Peru and Zenergy Malaysia totaling $50,581 as assets.  However, these "loans" reflected undocumented advances to consultants in those countries that Zenergy had no reason to believe would be repaid.

98.     The presentation of these "loans" as assets concealed Zenergy's lack of operations and assets, and misleadingly presented Zenergy as a business with prospects when it had none.

99.     Gasich, a substantial owner, control person, and purported consultant, and Luiten, the CEO and Chairman of Zenergy, knew or were reckless in not knowing that Zenergy's disclosures on the OTC Markets website were false and misleading.  Both were intimately familiar with Zenergy's business and operations, and both participated in the transactions that were discussed in the misleading disclosures.

100.     After the financial statements were posted on the OTC Markets website, OTC Markets removed the caveat emptor label and replaced it with a limited information legend.

### Press Releases Issued from October to December 2009

101.     With the removal of the caveat emptor label, Gasich and Luiten caused Zenergy to issue another series of press releases designed to inflate the price of Zenergy's stock.

102.     These press releases were initiated, reviewed, edited, and distributed by Gasich and reviewed and approved by Luiten.

103.     Several of these releases were false and misleading or designed to induce artificial interest in Zenergy's stock.

104.    On October 20, 2009, Zenergy announced that it had been communicating with acquisition candidates and had retained a large law firm as merger and acquisition counsel.

105.    Although technically accurate, the press release was designed to give the impression of merger and acquisition activity.

106.    On October 29, 2009, Zenergy announced that it had acquired a biofuel producer that could produce 5 million gallons of biofuel per year ("Biofuel Company").

107.    Contrary to these representations, the Biofuel Company's facility was not in production at the time; it had no feedstock, contracts, or revenue.

108.    Reasonable investors would have considered the nonexistent state of the Biofuel Company's operations important to their evaluation of an investment in Zenergy securities. The lack of operations was particularly relevant to investors given that Zenergy owned no other facilities.

109.    The October 29, 2009 press release also represented that the transaction would be funded internally, "as not to cause any dilution to shareholders."

110.    Contrary to the representations in the press release, part of the consideration for the acquisition was the transfer of 48 million Zenergy shares from Gasich's sister, J. Gasic, to Biofuel Company stockholders, which caused shareholder dilution. Although the shares were previously issued, the shares had been placed into the hands of J. Gasic to hold until the acquisition. At that point, the shares were transferred to Biofuel Company shareholders who, after a six-month lockup period, would sell them into the public market.

111.    The press release also failed to disclose Zenergy's assumption of a significant amount of debt in connection with the acquisition.

112.    The press release misleadingly gave the impression that the acquisition would be financed through cash, rather than through this transfer of previously issued shares and the assumption of debt by Zenergy.

113.    Reasonable investors would have considered the assumption of debt significant because, among other things, it materially altered Zenergy's liabilities and the claim on Zenergy's assets and affected the availability and use of Zenergy's cash flows.

114.    Three weeks later, on November 17, 2009, Zenergy announced that it had purchased feedstock from two sources to continue operations at the Biofuel Company's facility.

115.    However, Zenergy did not enter into any actual purchase orders until a month later, and those purchase orders were with a single supplier and related shipper, which absconded with Zenergy's deposits without supplying any feedstock.

116.    The failure to obtain feedstock was critical to Zenergy's operational capacity, given that Zenergy could not operate the Biofuel Company without a supply of feedstock, had not developed any other supply source, and lacked the resources to purchase any other supply.

117.    On December 4, 2009, Zenergy announced the completion of the Biofuel Company acquisition.

118.    Like the prior press releases, this release failed to disclose that the Biofuel Company facility was not in production and had no feedstock, contracts, or revenue.

119.    Gasich, a substantial owner, control person, and purported consultant, and Luiten, the CEO and Chairman of Zenergy, knew or were reckless in not knowing that the statements in the press releases published from October 2009 to December 2009 were false and misleading. Both were intimately familiar with Zenergy's business and operations, and both participated in the transactions that were discussed in the misleading disclosures.  Given his role organizing

21

promotional activity, Gasich also understood that the press releases were issued in connection with a promotional campaign.

### *Coordinated Touting Activity*

120.    Gasich coordinated another wave of touting activity in connection with these press releases.

121.    On September 7, 2009, Gasich notified Wilding that Zenergy was planning to file documents necessary to have the caveat emptor label removed by OTC Markets and sent Wilding a list of forthcoming press releases, several of which corresponded to the releases discussed above.

122.    Gasich also notified the touters of the issuance of the disclosures and releases, in some cases highlighting information to be disseminated by the touters, including the footnote in the financial statements describing the purchase of 3.8 million shares at $0.15 per share.  Baeten forwarded Gasich's email to Martino.

123.    On October 20, 2009, Baeten wrote his email list subscribers that he was "pounding the table here on ZENG; this is double-digit bound imho [in my humble opinion] and chart looks great for breakout here."

124.    On October 26 and 27, 2009, Gasich coordinated additional touting in connection with the October 29, 2009 press release.

125.    On or about November 19, 2009, Bennett posted several statements about Zenergy stock on a public investor website, including the statement that "you will see a run in this stock, of that I have NO DOUBT.  No matter what anyone says, this stock will move north in a good way."

126.     Around this same time, on or about November 20, 2009, Baeten approached Website Owner about scheduling a conference call for Zenergy to coordinate additional promotion.

127.     On November 30, 2009, Gasich directed his niece, Bozovic, to transfer 16 million shares of Zenergy to various touters—10 million shares to Website Owner and associated entities, 3 million shares to Baeten, and 3 million shares to Martino—and to enter into a purported internet marketing services agreement with Baeten.  At Gasich's direction, Bozovic also transferred 30 million shares to Nelson for the benefit of Gasich.

128.     On December 3, 2009, the day before the issuance of the press release announcing the completion of the Biofuel Company acquisition, Gasich emailed Baeten that he anticipated news from Zenergy that Friday and promotion on several websites, and asked Baeten to coordinate with Website Owner's website to profile Zenergy and send a Twitter alert over the weekend "to make [it] a huge week for everyone involved."  Baeten then relayed Gasich's update to Website Owner.  That same day, Bennett wrote that he foresaw "heavier than average volume . . . coming in December."

129.     From December 4 to 7, 2009, various stock newsletters repeated the touts and hyped Zenergy.

130.     On December 4, 2009, Baeten emailed his listserves that "ZENG on alert here looking strong expecting a move up on the charts Monday, should be a blast!!"

131.     The next day, Martino posted that "[t]his news is super solid.  The first move in ZENG should be up 200% to 300%."  In a separate message that day, he wrote that Zenergy was an "easy double."

132.     This second wave of promotional activity peaked in early December 2009.

23

133.    Gasich complemented the second wave of promotional activity with purchase activity.  On December 7, 2009, Gasich told Website Owner and Baeten that he and others working with him were "trying to support" the stock.  Gasich later promised "buying coming in from Chicago to help," and, in response to concerns about pressure on the share price, assured participants that "ZENG or everyone close to ZENG [were] not sellers . . . if we sell, it's in strength and never push our deal down."  In the weeks leading to the substantial increase in promotion, price, and volume in early December 2009, Gasich made or directed multiple purchases of Zenergy through accounts in the name of Lone Star; Nelson's entity, Sky's the Limit Consulting, LLC ("Sky's the Limit Consulting"); and Jovanovich's entity, Accelerated Innovations, LLC ("Accelerated Innovations") to support the price of Zenergy's stock.

134.    Zenergy's share price increased again during this second wave of promotional activity.  Following the peak of activity in August 2009, from August 11 through September 10, 2009, Zenergy's stock price descended to $0.02 share, remaining below that level until early October 2009.  From October 1 to 20, 2009, Zenergy's share price increased from $0.015 to $0.025 per share.  After returning to a price of $.015 per share in mid-November 2009, the price doubled on December 7, 2009 to $0.03 per share in response to the December promotional campaign.

135.    After this second peak, Zenergy's share price declined again, falling below a penny per share on February 17, 2010.

**Dalmy's Opinion Letters**

136.    Dalmy and all of the assignees other than Paradigm Associate B received shares that were designated as unrestricted as a result of inaccurate opinion letters submitted by Dalmy to Zenergy's transfer agent in June 2009.

24

137.     Opinion letters submitted by Dalmy from August to December 2009 permitted the issuance of purportedly unrestricted shares to others involved in the distribution of Zenergy's stock to the public.

### Opinion Letters Issued in June 2009

138.     On June 15, 2009, Dalmy sent the transfer agent two opinion letters, one for the shares of Paradigm Associate B and one for the shares of the other assignees, including her own shares.

139.     Both of Dalmy's opinion letters incorrectly represented that the shares being issued in connection with the Gasich assignment could be issued to and sold by the assignees without restriction pursuant to Rule 144 under the Securities Act.

140.     Dalmy had no reliable evidence upon which to base her opinion, and several of her representations were contrary to the information in Zenergy's books and records.

141.     Dalmy's opinion letters represented that the Gasich debt was reflected in the financial statements of Zenergy as of April 17, 2008, at which time Zenergy had "verbally agreed" that the debt could be convertible at Gasich's option into common stock of Zenergy at $0.0001 per share.

142.     Dalmy's opinion letters also concluded that at April 17, 2008, the alleged date of the Gasich debt, full consideration was given and the shares were deemed fully paid and non-assessable.

143.     However, no such debt was reflected in Zenergy's financial statements as of April 17, 2008.

144.     Further, although Dalmy purportedly relied on the convertible note in making these representations, Dalmy knew or was reckless in not knowing that the note was not authentic, because, among other things: (1) neither the note nor the convertible debt was

referenced in Zenergy's pre–May 2009 records; (2) the note was provided to her shortly after she supplied Gasich with a template on May 17, 2009; (3) the note conformed to her template but bore an April 17, 2008 date; and (4) the note's material terms and conversion rate substantially differed from those in all other convertible notes issued by Zenergy from 2006 to 2008, which themselves were identical to each other.

145.    Dalmy's opinion letters also incorrectly concluded that a one-year holding period for the stock issued pursuant to the Gasich "debt" began on April 17, 2008, the date of the alleged debt, and that the assignees were deemed to have held their shares in excess of one year from the date of April 17, 2008.

146.    Dalmy also falsely and without any reasonable inquiry represented that all of the assignees other than Paradigm Associate B were not affiliates of Zenergy.  In fact, through his direct and indirect ownership and management of Zenergy, Gasich directly, or indirectly through one or more intermediaries, controlled Zenergy.  Other assignees directly or indirectly controlled, were controlled by, or were under common control with Zenergy or Gasich, or sold for the account of Gasich or Zenergy.

147.    In addition, she falsely and without any reasonable inquiry represented that Zenergy was not a shell entity when Zenergy had no or nominal operations and no or nominal assets beyond cash.

148.    Dalmy also falsely and without any reasonable inquiry opined that "the requirements of Rule 144(b) have been met" and that the sale of the shares issued to the assignees were "exempt from the registration requirements…under the exemption set forth in Rule 144(b)" and could be subsequently sold or transferred by the assignees free of any restrictions on transfer.

## Opinion Letters Issued from August to December 2009

149. From August 2009 to December 2009, Dalmy issued additional opinion letters incorrectly representing that certain touters' shares and the shares of Paradigm Associate B could be sold without restriction pursuant to Rule 144.

150. Dalmy, who was dismissed as Zenergy's corporate counsel by August 13, 2009, represented herself in her opinion letters as "special counsel" to Zenergy.

151. Dalmy reiterated the baseless representations in her June 15, 2009 submissions in letters sent to transfer agents and broker-dealer firms regarding the shares of Baeten, Bennett, and Paradigm Associate B.

152. She continued to make these representations even after they were called into question by a lawyer for a broker-dealer who had received one of her opinion letters on July 1, 2009. The lawyer asked Dalmy whether the oral agreement to amend the debt was accompanied by any consideration and whether Dalmy had considered Gasich's affiliate status. Without obtaining any additional information regarding these issues, Dalmy continued to assert her original opinion.

153. Further, in the Baeten opinion letter, Dalmy represented that Baeten's shares were a gift from Wilding, even though she received a consulting services agreement between Baeten and Wilding's entity, through which Wilding agreed to compensate Baeten for promoting Paradigm stock.

154. Dalmy failed to conduct any reasonable inquiry to prepare her opinions.

**Trading Activity**

155.     Aggregated over both time periods, the Gasich assignees and their transferees

obtained total trading profits of at least $4.4 million from their sales of the assigned shares into

the public market in the following manner:

| Assignee | Transaction Dates | Number of Shares | Trading Profits |
|---|---|---|---|
| Jovanovich | July 2009-Mar. 2010 | 49 million | $1.3 million |
| Nelson | Aug. 2009-Dec. 2009 | 35 million | $0.8 million |
| Wilding | July 2009-Aug. 2009 | 27 million | $1.3 million |
| Website Owner | Sept. 2009-Dec. 2009 | 24 million | $0.5 million |
| Paradigm Associates A, B, and C | July 2009-July 2010 | 36 million | $0.5 million |
| Baeten | Mar. 2010 | 6 million | $40,751 |
| Bennett | Dec. 2009 | 2 million | $28,486 |
| Dalmy | Aug. 2009 | 1 million | $43,995 |

156.     In addition, J. Gasic and Bozovic transferred the majority of shares assigned to

them to Biofuel Company stockholders and to promoters, for which they received from Gasich

payments totaling approximately $25,575, and $12,500, respectively.

157.     No registration statement was filed or in effect for any of the transactions

described below.

**Gasich Associates**

158.     Gasich used Jovanovich, Nelson, J. Gasic, and Bozovic as third-party nominees

and custodians for himself, directing them to hold and trade stock at his direction and, in several

instances, transferring funds for his benefit.

159.     Gasich, personally and through his entities, received at least $633,518 from the

securities sales and transfers made by Jovanovich and Nelson.

28

*Jovanovich*

160.    Personally and through his entity, Accelerated Innovations, Jovanovich acted as a third-party nominee and custodian for Gasich, holding and trading stock at Gasich's direction, permitting Gasich to trade in his accounts, and transferring funds to Gasich or for his benefit.

161.    In total, Jovanovich generated $1,312,236 through his sales of Zenergy stock.

162.    From July through September 2009, Jovanovich sold over 17 million shares for a total of $1,001,320.

163.    Jovanovich began a second round of sales following Zenergy's posting of financial documents on the OTC Markets website in October 2009, generating profits of $310,916.

164.    Jovanovich transferred most of the trading profits from these sales to Gasich or, at Gasich's direction, to Zenergy and others, retaining approximately $108,299 for personal use.

165.    In August and September 2009, Jovanovich transferred a total of $347,618 in trading profits to Gasich's entity, Market Ideas.

166.    On September 2, 2009, Jovanovich transferred $550,000 in trading profits to Zenergy.

167.    In January 2010, Jovanovich wired $146,450 of trading profits to Market Ideas and, in April 2010, another $172,819 to Vertical Group, another entity controlled by Gasich.

*Nelson*

168.    Personally and through her entity, Sky's the Limit Consulting, Nelson acted as a third-party nominee and custodian for Gasich, holding and trading Zenergy securities at Gasich's direction, permitting Gasich to trade in her personal and corporate accounts, and transferring funds to Gasich or for his benefit.

169.     Until Nelson terminated her engagement to Gasich in December 2009, Gasich controlled the trading in her accounts and the resulting trading profits.

170.     Through Nelson's accounts, Gasich sold over 35 million shares from August 10 to December 30, 2009 for total trading profits of $804,068.

171.     Gasich initially sold shares through these accounts until November 2009, after which he purchased shares from November 17 to December 8, 2009 to support the stock price.

172.     Gasich resumed selling shares through these accounts on December 7, 2009, when another wave of promotional activity increased Zenergy's share price and volume substantially.

173.     From late 2009 to early 2010, Nelson transferred $150,000 of trading profits to Gasich.

174.     Other trading profits were used for personal expenses benefitting both Gasich and Nelson.

175.     On February 4, 2010, after breaking her engagement to Gasich, Nelson transferred the remaining 16.3 million shares and $410,396 in trading profits to new accounts not controlled by Gasich.

### J. Gasic

176.     J. Gasic acted as a third-party nominee and custodian for Gasich, holding and transferring shares of Zenergy at his direction, in exchange for payments from Gasich.

177.     On or about September 29, 2009, Gasich, through Market Ideas, paid J. Gasic a total of approximately $25,575.

178.     Thereafter, on or about November 9, 2009, J. Gasic transferred 48 million unrestricted shares to owners of Biofuel Company as partial consideration for Zenergy's acquisition.

179.     After the expiration of a "leak-out agreement" prohibiting sales exceeding one sixth of their position for six months, four of the former owners of Biofuel Company subsequently sold 34.7 million of these shares from May 12, 2010 to July 15, 2010 for trading profits of $50,916.

180.     The purpose of the leak-out agreement was not to ensure investment intent, but instead to prevent the flooding of shares into the marketplace.  Other than the leak-out agreement, which only lasted for six months and permitted limited sales, neither Gasich nor J. Gasic took steps to assure that the former owners intended to hold the securities for investment purposes.

181.     J. Gasic retained the remaining 1 million shares transferred to her from Gasich.

### *Bozovic*

182.     Bozovic also acted as a third-party nominee and custodian for Gasich, holding and transferring shares at his direction in exchange for payments from Gasich.

183.     On October 2, 2009, Gasich, through Market Ideas, paid Bozovic $10,000, and on November 30, 2009, another $2,500.

184.     On November 30, 2009, Bozovic transferred 46 million shares at Gasich's direction to touters and to Sky's the Limit Consulting.

185.     In return, at least one of the touters signed an agreement with Bozovic promising to provide promotional services for Zenergy.

186.     Bozovic retained the remaining 3 million shares that she had received from Gasich.

### Promoters and Touters

187.     Wilding, Website Owner, and touters retained by Wilding also profited from the increase in stock price caused by the promotion.

188.    From July 6 to August 19, 2009, Wilding sold 26.6 million shares for a total of $1,331,365.  After the first phase of promotional activity, in transactions during September and December 2009, Wilding traded 4 million shares for a net gain of $32,695.

189.    From September 11 to 23, 2009, one of Website Owner's entities profited $286,518 from selling 16 million shares received from Gasich and Wilding in exchange for internet promotion.  In addition, from December 4 to 10, 2009, the same Website Owner's entity obtained another $201,310 of trading profits by selling 8 million shares that it had received from Gasich's niece as part of a November 30, 2009 distribution of shares to touters.

190.    On March 5 and 9, 2010, Baeten sold the 6 million shares he received from Wilding and Bozovic for total trading profits of $40,751.

191.    From December 16 to 21, 2009, Bennett sold the 2 million shares he received from Wilding on August 7, 2009, generating $28,486 in trading profits.

192.    Bowker and Martino did not sell shares in the same manner as the other touters because Wilding never transferred the promised shares to Bowker, and Martino could not clear the shares he received.

193.    However, Bowker and Martino, along with Baeten and Bennett, bought and sold shares from the public during promotional activity in an attempt to profit from the price fluctuation, with varying degrees of success.  Bowker traded 82,000 shares for a net gain of $1,216.  Martino traded 1,024,420 shares for a net loss of $1,263.  Baeten traded 1,865,199 shares for a net loss of $21,049.  Bennett traded 1,688,326 shares for a net loss of $693.

**Dalmy**

194.    Dalmy also profited from her sales of the assigned shares, which she received as compensation for her work on the reverse merger and for issuing the June 2009 opinion letters.

195.    From August 12 to 18, 2009, Dalmy sold 1 million shares for a profit of $43,995.

32

196. Dalmy sold her shares at the apex of the price increase.

## COUNT I

### VIOLATIONS OF SECTIONS 5(a) AND (c) OF THE SECURITIES ACT
### [15 U.S.C. §§ 77e(a) and (c)]
### (Against Defendants Zenergy, Gasich, Wilding, Skyline Capital, and Dalmy)

197. Paragraphs 1 through 196 are realleged and incorporated herein by reference.

198. By their conduct, Defendants Zenergy, Gasich, Wilding, Skyline Capital, and Dalmy directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

199. By reason of the foregoing, Defendants Zenergy, Gasich, Wilding, Skyline Capital, and Dalmy violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

200. By reason of the foregoing, Defendant Wilding violated a cease-and-desist order entered by the Commission pursuant to Section 8A of the Securities Act.

## COUNT II

### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(1)]
### (Against Defendants Zenergy and Gasich)

201.     Paragraphs 1 through 196 are realleged and incorporated herein by reference.

202.     By engaging in the conduct described above, Defendants Zenergy and Gasich, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes, and artifices to defraud.

203.     Defendants Zenergy and Gasich intentionally or recklessly engaged in the fraudulent conduct described above.

204.     By reason of the foregoing, Defendants Zenergy and Gasich violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(2)]
### (Against Defendants Zenergy, Gasich, and Luiten)

205.     Paragraphs 1 through 196 are realleged and incorporated herein by reference.

206.     By their conduct, Defendants Zenergy, Gasich, and Luiten, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

207.     By reason of the foregoing, Defendants Zenergy, Gasich, and Luiten violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV

### VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(a)(3)]
### (Against Defendants Zenergy and Gasich)

208.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

209.    By engaging in the conduct described above, Defendants Zenergy and Gasich, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

210.    By reason of the foregoing, Defendants Zenergy and Gasich violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)]
### AND RULE 10b-5(a) THEREUNDER [17 C.F.R. § 240.10b-5]
### (Against Defendants Zenergy and Gasich)

211.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

212.    By their conduct, Defendants Zenergy and Gasich, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, employed devices, schemes, and artifices to defraud.

213.    Defendants Zenergy and Gasich intentionally or recklessly engaged in the fraudulent conduct described above.

214.    By reason of the foregoing, Defendants Zenergy and Gasich violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) thereunder [17 C.F.R. § 240.10b-5].

## COUNT VI

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)] AND RULE 10b-5(b) THEREUNDER [17 C.F.R. § 240.10b-5] (Against Defendants Zenergy, Gasich, and Luiten)

215. Paragraphs 1 through 196 are realleged and incorporated herein by reference.

216. By their conduct, Defendants Zenergy, Gasich, and Luiten, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

217. Defendants Zenergy, Gasich, and Luiten made the untrue statements and omissions of material fact.

218. Defendants Zenergy, Gasich, and Luiten intentionally or recklessly engaged in the fraudulent conduct described above.

219. By reason of the foregoing, Defendants Zenergy, Gasich, and Luiten violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## COUNT VII

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)] AND RULE 10b-5(c) THEREUNDER [17 C.F.R. § 240.10b-5] (Against Defendants Zenergy and Gasich)

220. Paragraphs 1 through 196 are realleged and incorporated herein by reference.

221. By their conduct, Defendants Zenergy and Gasich, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, engaged in transactions, practices, or courses of

business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

222. Defendants Zenergy and Gasich intentionally or recklessly engaged in the fraudulent conduct described above.

223. By reason of the foregoing, Defendants Zenergy and Gasich violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

## COUNT VIII

**AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER [15 U.S.C. § 78t(e)] (Against Defendants Gasich and Luiten)**

224. Paragraphs 1 through 196 are realleged and incorporated herein by reference.

225. As described above, Defendant Zenergy violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

226. By their conduct, Defendants Gasich and Luiten each provided substantial assistance to Defendant Zenergy in its unlawful conduct.

227. By their conduct, Defendants Gasich and Luiten acted knowingly or recklessly in aiding and abetting Zenergy's violations of Section 10(b) and Rule 10b-5.

228. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Gasich aided and abetted Zenergy's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

229. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Luiten aided and abetted Zenergy's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

## COUNT IX

## CONTROL PERSON LIABILITY FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER
### [15 U.S.C. § 78t(a)]
### (Against Defendants Gasich and Luiten)

230.     Paragraphs 1 through 196 are realleged and incorporated herein by reference.

231.     As described above, Defendant Zenergy violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

232.     Through their positions and by their conduct, Defendants Gasich and Luiten exercised general control over the operations of Zenergy.

233.     Through their positions and by their conduct, Defendants Gasich and Luiten possessed the power or ability to control the specific transactions and activities upon which the Zenergy's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder are based, whether or not that power was exercised.

234.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Gasich is jointly and severally liable with, and to the same extent as, Zenergy for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

235.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Luiten is jointly and severally liable with, and to the same extent as, Zenergy for its violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

## COUNT X

## VIOLATIONS OF SECTION 17(b) OF THE SECURITIES ACT
### [15 U.S.C. § 77q(b)]
### (Against Defendant Martino)

236.     Paragraphs 1 through 196 are realleged and incorporated herein by reference.

38

237. By their conduct, Defendant Martino used the means or instruments of interstate transportation, or communication in interstate commerce, or the mails, to publish or circulate communications which described securities for a consideration received or to be received, directly or indirectly from the issuers, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

238. By reason of the foregoing, Defendant Martino violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## COUNT XI

## RELIEF DEFENDANT

239. Paragraphs 1 through 196 are realleged and incorporated herein by reference.

240. Relief Defendant Market Ideas received or benefited from the registration violations and fraudulent conduct described above. These funds are the proceeds, or are traceable to the proceeds, of the unlawful activity alleged above.

241. Relief Defendant Market Ideas has no legitimate claim to these funds.

242. The Commission is entitled to an order requiring Relief Defendant Market Ideas to disgorge, jointly and severally with Gasich, the amount of proceeds received by it.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

## I.

Find that Defendants committed the violations alleged herein.

## II.

Issue orders of permanent injunction restraining and enjoining Defendants Zenergy, Gasich, Wilding, Skyline Capital, and Dalmy, their agents, servants, employees, attorneys, and

all persons in active concert or participation with them, from violating Section 5 of the Securities Act [15 U.S.C. §§ 77e].

### III.

Issue orders of permanent injunction restraining and enjoining Defendants Zenergy, Gasich, and Luiten, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### IV.

Issue orders of permanent injunction restraining and enjoining Defendant Martino, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

### V.

Order Defendants Zenergy, Gasich, Luiten, Wilding, Skyline Capital, Dalmy, Martino, and Market Ideas to pay disgorgement of ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon. Given the close relationship between certain individuals and their alter ego entities in engaging in the misconduct—Gasich and Market Ideas, and Wilding and Skyline Capital—joint and several liability is appropriate as between those individuals and their respective entities.

### VI.

Order Defendants Gasich, Luiten, Wilding, Skyline Capital, Dalmy, and Martino to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and, with respect to Gasich and Luiten, Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VII.**

Order Defendant Wilding to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] for violation of a cease-and-desist order entered by the Commission pursuant to Section 8A of the Securities Act.

**VIII.**

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendants Zenergy, Gasich, Luiten, Wilding, Skyline Capital, Dalmy, and Martino, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**IX.**

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Defendants Gasich and Luiten from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**X.**

Retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**XI.**

Grant such other and further relief as the Court deems just and appropriate.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable pursuant to the

Federal Rules of Civil Procedure.


Dated:  August 1, 2013                        Respectfully submitted,

                                              s/   Daniel J. Hayes

                                              Daniel J. Hayes (hayesj@sec.gov)
                                              John E. Birkenheier (berkenheierj@sec.gov)
                                              Paul M. G. Helms (helmsp@sec.gov)
                                              Kathryn A. Pyszka (pyszkak@sec.gov)
                                              U.S. Securities and Exchange Commission
                                              175 West Jackson Boulevard, Suite 900
                                              Chicago, Illinois 60604
                                              Telephone:  (312) 353-7390
                                              Facsimile:  (312) 353-7398

                                              *Attorneys for Plaintiff U.S. Securities and Exchange
                                              Commission*