# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 13-cv-5511 |
| v. | ) ) | Judge Joan B. Gottschall |
| ZENERGY INTERNATIONAL, INC., *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

This case is part of the fall-out of a penny-stock pump-and-dump scheme. In June 2009, defendant Bosko R. Gasich ("Gasich") and other individuals associated with Zenergy International, Inc. ("Zenergy") acquired the publicly traded stock of Paradigm Tactical Products, Inc. ("Paradigm") through a reverse-merger. In connection with the merger, Gasich assigned convertible debt securities that he had received from Zenergy to several of his friends, family members, and business associates, who subsequently converted the assigned securities into 300 million shares of Zenergy stock. Gasich and others then organized a campaign to promote Zenergy in press releases and over the Internet. Between June 2, 2009 and mid-August 2009, the price per share of Zenergy stock increased approximately tenfold. As the share price increased, Gasich's assignees sold their stock to unsuspecting investors. The assignees generated $4.4 million in profits.

On August 1, 2013, the SEC brought this action against Gasich, Zenergy, and other persons for alleged violations of federal securities laws. Now before the court is the SEC's

motion for partial summary judgment against defendant Diane D. Dalmy ("Dalmy") for her alleged violation of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e ("Section 5"). Dalmy was one Gasich's assignees who sold shares of Zenergy stock. She was also the transaction attorney who advised the principals of Zenergy and Paradigm as they executed the reverse merger.

For the reasons set forth herein, the court agrees with the SEC that no genuine issue of fact exists as to Dalmy's liability under Section 5. The SEC's motion is therefore granted.

I. FACTS[1]

A. Zenergy

Zenergy was incorporated as a purported biofuels company in July 2006. Its original founders were Gasich, defendant Robert J. Luiten ("Luiten"), and their now-deceased business partner, Martin McIntyre ("McIntyre"). Each individual owned one-third of Zenergy's stock, which equated to 10 million shares, respectively.

Zenergy was initially financed through capital contributions by Gasich and McIntyre. Gasich also loaned $30,000 to Zenergy in April 2008 in exchange for convertible debt securities, according to a promissory note that Gasich prepared. The convertible debt securities purportedly gave Gasich the right to convert $0.001 (par value of the stock) of debt into one share of Zenergy. If fully exercised, Gasich could convert the debt securities into 30 million Zenergy shares.

Through most of Zenergy's existence, Gasich, Luiten, and McIntyre all participated in managing the company either as officers or paid consultants. From July 2006 to 2010, Luiten served as Zenergy's Chief Executive Officer, Chairman of the Board, and sole director.

---

[1] Citations to the SEC's Local Rule 56.1 Statement of Facts are noted as "SEC SOF ¶ __."

Notwithstanding these formal titles, Luiten shared his responsibilities with Gasich and McIntyre. Gasich had access to Zenergy's bank accounts, and Zenergy's office address was a site that Gasich maintained. Moreover, Gasich consulted Zenergy through his company, Market Ideas, Inc. Gasich was the President, Chief Executive Officer, and sole shareholder of Market Ideas. In 2006, Market Ideas "provided capital investment and advisory services" in connection with the founding of Zenergy. (*See* SEC Ex. 7, Gasich Aff. ¶ 3). Thereafter Market Ideas advised Zenergy with respect to its "corporate development, deal negotiations, capital structure, locating and procuring key management, site procurement, and engaging institutional investors." (*Id.* ¶ 4).

### B. McIntyre's Death

McIntyre died in June 2008. Although his widow inherited his stock, she did not assume his role in the company or otherwise participate in Zenergy's operation. Instead, Luiten and Gasich effectively co-managed the company.

### C. Zenergy's Reverse Merger with Paradigm

Sometime between 2008 and early 2009, Gasich and Luiten decided to pursue external funding. Rather than appeal directly to investors, they looked for publicly traded shell companies to merge with Zenergy so that Zenergy could issue stock. Both the SEC and Zalmy refer to the type of transaction Gasich and Luiten desired as "a reverse merger." As stated on Zalmy's website,

> A reverse merger is a method by which an active privately-owned operating company goes public by completing a transaction with a public shell company, with the public company surviving the transaction but having issued a controlling share of the company's stock to the owners of the privately-owned operating company. The public shell company then typically changes its name to reflect the operating business of the privately-owned operating company. Most public

3

companies that enter into reverse mergers are shell companies, which are companies that have no significant operations or assets.[2]

(SEC SOF ¶ 19).

On or about March 23, 2009, defendant Scott H. Wilding ("Wilding") and Gasich began discussing a reverse merger transaction between Zenergy and Paradigm.[3] Wilding had been marketing Paradigm, a supposed seller of handheld security devices, to companies seeking access to publicly traded shares.[4] During the SEC's investigation that preceded this suit, Wilding testified and explained the rationale for merging two companies with different businesses: "There is no rationale: one is a shell, there is nothing there, and one wanted to go public." (SEC SOF ¶ 22).

Wilding was not alone in understanding the purpose of the Zenergy-Paradigm reverse merger: other participants in the transaction also viewed Paradigm as a "shell" company that had the ability to issue public shares. Paradigm's Chief Executive Officer, Vincent Cammarata, admitted that Paradigm "had zero operating capital" at the time of its reverse merger with Zenergy. (SEC SOF ¶ 28). Gasich averred that his company, Market Ideas, "assisted Zenergy in locating" Paradigm as "a merger candidate" so that Zenergy could "becom[e] a public company"

---

[2] Dalmy challenges the admissibility of the SEC's citation to her website for lack of authentication. The court notes that Dalmy's website, or at least a website advertising her legal services and identifying her email address, still displays this same explanation of a reverse merger that the SEC incorporated into its Statement of Facts. Regardless of the authenticity of the website, the court cites its explanation of a reverse merger solely for context.

[3] On February 17, 2004, Administrate Law Judge Brenda P. Murray ordered Wilding to cease and desist from violating Sections 5(a) and (c) of the Securities Act. *See In re Research Investment Group*, Securities Act Release No. 83871 (Feb. 17, 2004) (http://www.sec.gov/litigation-admin/33-8387.htm).

[4] Before conferring with Gasich, Wilding attempted to negotiate a reverse merger between Paradigm and Naturally Splendid Enterprises, Ltd., an alleged seller of nutritional supplements. Zalmy worked with Wilding on this transaction, which evidently failed to materialize.

via a reverse merger. (SEC Ex. 7, Gasich Aff. ¶ 5). Luiten also understood that Gasich had identified Paradigm as a shell company "for the purpose of entering a reverse merger." (SEC Ex. 3 ¶ 6). Dalmy testified that she first became involved in the deal in March 2009, after Wilding contacted her to obtain "legal services related to a reverse stock split. . . ." (Dalmy Ex. 6, Dalmy Dep. 35:1-8). She admits that she understood that Paradigm would deliver "zero" assets and liabilities at closing. (*See* SEC Ex. 30, Dalmy Dep. 145:1-8).

The transaction itself commenced on March 31, 2009, when Zenergy and Paradigm entered into a memorandum of understanding. The memorandum specified that Paradigm would "deliver at closing 0/0 assets/liabilities." (SEC SOF ¶ 32). Zenergy and Paradigm then entered into a Share Exchange Agreement on or about May 28, 2009. Pursuant to this agreement, which Dalmy prepared with Gasich's assistance, Zenergy was to merge into Paradigm to allow Zenergy's shareholders to gain control over Paradigm. Both companies approved the Share Exchange Agreement on or about June 8-9, 2015.

On or about June 12, 2009, Zenergy shareholders received 216,232,100 restricted shares pursuant to the Share Exchange Agreement. The shares gave Zenergy shareholders a 91.5% stake in Paradigm. Gasich, Luiten, and McIntyre's widow each received approximately 67 million shares, based on the interests they held in Zenergy before the reverse merger.[5]

---

[5] Dalmy challenges the notion that Gasich received 67 million shares through the merger. She contends that those shares were technically issued to a company, The Spire Group, LLC ("Spire Group"), and that the SEC has failed to submit admissible evidence verifying that Gasich was the sole owner of the Spire Group. But Dalmy misses the point. Ultimately, the issue is whether Gasich exercised control over the shares that he directed to the Spire Group. *See infra* at 11-14. Two undisputed facts show that Gasich exercised complete control over those shares. First, Gasich himself stated that he was directing the shares to which he was entitled, based on his pre-merger ownership interest in Zenergy, to the Spire Group. On June 5, 2009, Gasich wrote an email to Luiten indicating that he "just had a call" with Dalmy "in terms of format" for the division of shares Zenergy would receive pursuant to the Share Exchange Agreement. *See* SEC Ex. 46. Gasich provided a "break down" of the distribution of the 216,232,100 shares in his

5

## D. The Gasich Assignment

In connection with the reverse merger, Paradigm agreed to assume the $30,000 worth of convertible debt that Zenergy purportedly owed to Gasich. However, the value of the debt changed: rather than equal $0.001 per share, the conversion rate was revised to $0.0001 per share. The new conversion rate meant Gasich could convert his securities into 300 million shares of Zenergy stock instead of 30 million shares.

Gasich assigned portions of his debt securities to members of his family, his friends, associates of Paradigm, Dalmy, and others. The assignees subsequently converted their assigned debt into hundreds of millions of shares of stock. Dalmy received 4 million shares for her role as counsel for the reverse merger.

## E. The Public Sale of Zenergy's Post-Merger Shares

From June 2009 to December 2009, Gasich, Wilding and others promoted Zenergy by issuing press releases and posting information on internet message boards. The following chart reflects the increase in share price and volume activity of Zenergy stock between January 2009 and July 2010.

---

email to Luiten. *Id.* Although Gasich's name is not listed among the recipients of shares, he stated the following: "The Spire Group, LLC 66,663,331 shares (*converting my shares to corporation*)." *Id.* (emphasis added). Thus, the Spire Group served as a repository in which Gasich deposited the shares he was due. Second, even if there is no authenticated paperwork establishing Gasich's sole ownership of the Spire Group, Dalmy does not dispute that he was entitled to receive those shares before he transferred them to the Spire Group. It is undisputed that Gasich (a) held a one-third ownership interest in Zenergy before the merger, and (b) was due an amount of shares in the post-merger Zenergy proportionate to what his co-owners, Luiten and McIntyre's widow, obtained. Luiten and McIntyre both received approximately 67 million shares. Gasich was thus entitled to receive a similar amount. It is thus no coincidence that Gasich directed approximately 67 million shares to the Spire Group. That amount is what he owned. Thus, regardless of how Gasich used or transferred those shares, the upshot is he, alone, controlled their distribution.

**Zenergy Share Price and Volume Activity (January 2009 to July 2010)**



Gasich's assignees obtained at least $4.4 million from their sales. Dalmy deposited her 4 million Zenergy shares into her personal account at Scottrade on or about August 12, 2009. She then sent Scottrade one of her opinion letters, the convertible note, and other documents to show that her shares could be sold as unrestricted stock to the public. Between August 12 and August 18, 2009, she sold 1 million Zenergy shares to public investors for $43,995. She deposited the proceeds into her Scottrade account and subsequently used them for personal expenses.

### F. Dalmy's Role in the Reverse Merger

Dalmy performed a variety of services as the transaction attorney for the reverse merger between Zenergy and Paradigm. She advised the parties regarding implementing the transaction

7

and prepared its essential documents, including the Share Exchange Agreement, board resolutions, and other corporate filings. Then, following the reverse merger, Dalmy prepared several opinion letters representing that the stock Gasich assigned to her and other assignees was exempt from the registration requirements of Section 5 of the Securities Act. It is undisputed that no registration statement was filed or in effect for any of sales of Zenergy shares that Gasich's assignees made, and that the shares were not exempt.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. DISCUSSION

"Section 5 of the Securities Act of 1933 requires a valid registration statement before securities are sold in or by means of interstate commerce. . . ." *United States v. Dokich*, 614 F.3d 314, 321 (7th Cir. 2010) (citing 15 U.S.C. § 77e). The SEC can establish a prima facie violation of Section 5 by showing that (1) the defendant directly or indirectly sold or offered to sell securities, (2) no registration statement was in effect or filed as to the securities involved, and (3) the offer or sale was made through the use of interstate facilities or the mails. *See S.E.C. v.*

*Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill. 1999) (citing *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155–56 (5th Cir.1972)). "A person not directly engaged in the transfer of the title of a security can be held liable if he has 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *S.E.C. v. Greenstone Holdings, Inc*., No. 10-cv-1302, 2012 WL 1038570, at *11 (S.D.N.Y. Mar. 28, 2012) (quoting *SEC v. Chinese Consol. Benevolent Ass'n, Inc.,* 120 F.2d 738, 741 (2d Cir.1941)). The defendant's "participation must be substantial, not *de minimis*," to be found liable as an indirect seller. *Greenstone Holdings*, 2012 WL 1038570, at *11.

Here, Dalmy does not dispute that she violated Section 5. She directly sold one million shares of Zenergy stock for $43,995. Nor does she contest the SEC's argument that she acted as an indirect seller in the sales of Zenergy stock by Gasich's assignees by virtue of the opinion letters she issued. *See Greenstone* Holdings, 2012 WL 1038570, at *11 ("As general counsel, Frohling wrote and approved opinion letters without which CST would not have issued any unregistered shares. Such conduct is sufficient to hold an attorney liable under Section 5."); *accord S.E.C. v. Gendarme Capital Corp*., No. 11-cv-0053, 2012 WL 346457, at *4 (E.D. Cal. Jan. 31, 2012).

The sole disputed issue in this case is whether Dalmy and Gasich's other assignees' sales of Zenergy stock were exempt from the registration requirements of Section 5.[6] If no exemption applies to Dalmy's and the other assignees' sales of unregistered Zenergy securities, then Dalmy is liable under Section 5, and the SEC is entitled to partial summary judgment.

---

[6] Dalmy argues that she sold her shares and issued her advisory opinions in good faith, but scienter is not an element of a violation of Section 5. *See SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (per curiam). Dalmy's purported good faith belief that the Zenergy shares were exempt from registration is thus not a defense to liability under Section 5.

9

The only exemption that Dalmy invokes is Section 4(1) of the Securities Act, 15 U.S.C. § 77d(1) ("Section 4(1)"). Section 4(1) provides an exemption to the registration requirements of Section 5 "for transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1)).[7] "The term 'issuer' means every person who issues or proposes to issue any security. . . ." 15 U.S.C. § 77b(a)(4). An "underwriter" is "any person who has purchased from an issuer with a view to . . . the distribution of any security." *Id.* § 77b(a)(11). And a "dealer" is "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person." *Id.* § 77b(a)(12).

Here, the applicability of the term "underwriter" is at issue.[8] It is undisputed that Dalmy acquired her Zenergy stock from Gasich. The SEC asserts that Dalmy is ineligible for the Section 4(1) exemption because Gasich was an "underwriter" to the reverse merger. Dalmy agrees that if Gasich qualifies as an underwriter to Zenergy's distribution of unregistered securities, then his assignment of shares to her and her subsequent resale were not exempt from registration.

The General Rules and Regulations to the Securities Act of 1933 provide guidance for understanding the term, "underwriter," for the purpose of "determining whether or not the Section 4(1) exemption from registration is available for the sale of [unregistered] securities." *See* 17 C.F.R. § 230.144. This rule, referred to as "Rule 144," "creates a safe harbor from the Section 2(a)(11) definition of 'underwriter.'" *Id.* Essentially, if a person satisfies the criteria of

---

[7] Stated differently, stock sales by "issuers," "underwriters," and "dealers" *are* subject to the registration requirements of Section 5.

[8] The SEC does not contend that Gasich acted as an "issuer," as Paradigm (renamed Zenergy) issued the shares. Nor does the SEC claim that Gasich was a "dealer" when he assigned his shares.

the Rule 144 safe harbor, then that person "is deemed *not* to be engaged in a distribution of the securities and therefore not an underwriter of the securities for purposes of Section 2(a)(11)." *Id.* (emphasis added).

The critical inquiry here is whether Gasich satisfies all of the conditions of the Rule 144 safe harbor; if he does not, Dalmy acknowledges that the SEC must prevail in its Section 5 claim against her.

Both the SEC and Dalmy focus on two conditions under Rule 144. First, Rule 144 imposes a one-year holding period requirement. *See* § 230.144(d)(1)(ii). That is, a minimum of one year must elapse between the later of (1) the date of the acquisition of the securities from the issuer, *or from an affiliate of the issuer*, and (2) any resale of such securities. *Id.* (emphasis added). Second, the Rule 144 safe harbor is unavailable to securities issued by shell companies. § 230.144(i). A shell company is defined as an issuer "with no or nominal operations and no or nominal non-cash assets." *Id.*

The court first analyzes whether Dalmy's public sale of Zenergy stock was subject to the holding period requirement. If this requirement applied to Dalmy's sale of Zenergy shares, it is undisputed that she did not comply with it because she acquired her stock from Gasich in June 2009 and sold it to the public in August 2009.[9] The only question is whether Gasich was an "affiliate of the issuer," Zenergy. If he was, then the holding requirement applies, and Dalmy would be ineligible for the Rule 144 safe harbor and the Section 4(1) exemption.

Rule 144 defines an "affiliate of an issuer" as "a person that directly, or indirectly through one or more intermediaries, *controls*, or is controlled by, or is under common control

---

[9] The same analysis applies to Gasich's other assignees. All of their resales took place less than a year before the one-year holding period expired. So, if Gasich qualifies as an affiliate of Zenergy, then Dalmy also violated Section 5 by serving as an indirect seller to the other assignees' sales.

with, such issuer." § 230.144(a)(1) (emphasis added). Although "Rule 144 fails to define 'control,' Rule 405 of Regulation C establishes a definition of 'affiliate' identical to that of Rule 144 and defines 'control' as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005) (quoting § 230.405); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (holding that control "depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved"). "A person may be in control even though he does not own a majority of the voting stock, and such control may rest with more than one person at the same time or from time to time. . . ." *Corr*, 543 F.2d at 1050 (citations omitted). "Although there is no bright-line rule declaring how much stock ownership constitutes 'control' and makes one an 'affiliate' under Section 4(1), some commentators have suggested that ownership of something between ten and twenty percent is enough, especially if other factors suggest actual control." *S.E.C. v. Cavanagh*, 445 F.3d 105, 114 n. 19 (2d Cir. 2006).

The undisputed facts in this case show that Gasich exerted sufficient control over Zenergy to qualify as an affiliate.[10] First, Gasich possessed the power to direct Zenergy's policies through his stock ownership and by contract. As was one of Zenergy's principal founders, he owned approximately 10 million shares of the company's outstanding stock, as did its other founders, Luiten and McIntyre. But Gasich owned something that Luiten and McIntyre did not: convertible debt securities. These securities gave Gasich the contractual power to

---

[10] Given the court's ruling that Dalmy failed to comply with the one-year holding requirement, it is unnecessary for the court to resolve whether Zenergy or Paradigm were shell companies as understood in the Rule 144 context.

convert the $30,000 he loaned to Zenergy into an additional 30 million shares of Zenergy stock, a conversion that would have given him a majority stake in the company before it merged with Paradigm.

After the merger, Gasich's ownership control increased. He, Luiten, and McIntyre's widow all received approximately 66 million shares in the post-merger Zenergy. These shares corresponded to the one-third interest each of them held in the company. In an email dated June 5, 2009, Gasich emailed Luiten with a "break down" of the 216,232,100 shares that Zenergy received through the reverse merger. *Id.* Although Gasich did not include himself among the list of recipients, he stated that he "convert[ed] [his] shares to [the] corporation," the Spire Group. The 66,663,331 shares Gasich "converted" to the Spire group roughly equaled the number of shares that his Zenergy co-founders, Luiten and McIntyre, received.[11]

Gasich subsequently received even more shares when he exercised his right to convert his debt securities. Gasich converted his $30,000 worth of debt securities into 300 million post-merger shares. He then assigned those shares to members of his family, his friends, associates of Paradigm, Dalmy, and others. If the shares Gasich held in the Spire Group are combined with the 300 million shares he assigned, Gasich controlled 366,663,331 out of the 536 million shares outstanding.

Additionally, separate from his ownership interests, Gasich possessed sufficient influence over Zenergy to confirm his status as an affiliate. Before the merger, Zenergy's CEO, Luiten, shared managerial responsibilities with Gasich. While both principals weighed in on the company's major strategic decisions, Gasich spearheaded its merger with Paradigm. Gasich's company, Market Ideas, "assisted Zenergy in locating" Paradigm as "a merger candidate" so that

---

[11] Luiten acquired 66,663,331 shares, and McIntyre's widow obtained 66,615,338 shares

13

Zenergy could go public. (SEC Ex. 7, Gasich Aff. ¶ 5). During the transaction, Dalmy's primary contacts were Wilding on behalf of Paradigm and Gasich on behalf of Zenergy. Dalmy acknowledges that Gasich assisted her in drafting the documents necessary to effectuate the transaction. In Dalmy's own words, "Gasich had significant involvement" in the negotiations on behalf of Zenergy. (*See* Dalmy's Resp. to SEC's SOF ¶ 46). Gasich and Luiten jointly approved the merger agreement and board resolutions on Zenergy's behalf. After executing the reverse merger, Gasich, Wilding and others promoted Zenergy by issuing press releases and by posting on internet message boards. Gasich thereafter controlled the distribution of approximately 366 million shares, or 68% of the total number of shares outstanding.

In sum, Gasich was an "affiliate" of Zenergy because Zenergy was under Gasich's control. Consequently, because of Gasich's affiliate status, Rule 144 required Dalmy to wait a year before she sold her Zenergy stock, since she acquired her shares from Gasich. She did not do so. Because Dalmy failed to comply with the one-year holding requirement, she cannot invoke the Rule 144 safe harbor or the Section 4(1) exemption.

## IV. Conclusion

For the reasons set forth herein, the court finds that Dalmy is liable for selling unregistered securities in violation of Section 5. Accordingly, the SEC's motion for partial summary judgment is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 2015