# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) Case No. 13-CV-5511 |
| Plaintiff, | ) ) |
| vs. | ) Judge Joan B. Gottschall ) |
| ZENERGY INTERNATIONAL, INC., et al., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION & ORDER

Before the court is the SEC's motion for award of monetary remedies and for entry of final judgments as to Defendants Bosko R. Gasich ("Gasich"), Market Ideas, Inc. ("Market Ideas"), Robert J. Luiten ("Luiten"), Scott H. Wilding ("Wilding"), and Skyline Capital Investments, Inc. ("Skyline Capital") (collectively, the "Settling Defendants") [ECF No. 87.] Also before the court is the SEC's motion for award of remedies and for entry of final judgments as to Defendants Diane D. Dalmy ("Dalmy") and Ronald Martino ("Martino"). [ECF No. 89.] For the following reasons, the SEC's motions are granted.

## I. INTRODUCTION

The SEC's Complaint alleges that the Settling Defendants, Martino, and Dalmy devised and implemented a "pump-and-dump" scheme involving the stock of Zenergy International, Inc. ("Zenergy").[1] [Complaint, ECF No. 1.] The SEC's Complaint generally seeks two categories of relief against the defendants: injunctions and monetary remedies. Soon after the SEC filed its Complaint, the Settling Defendants entered into "bifurcated" settlements, by which they

---

[1] The facts in this case are more thoroughly addressed in this court's September 30, 2015 Order granting partial summary judgment in favor of the SEC against Dalmy. [9/30/15 Order, pp. 2-8, ECF No. 84.]

consented to the injunctive relief sought by the SEC.[2]  Pursuant to those settlement agreements, the Court entered partial consent judgments ("Consent Judgments") imposing the injunctive relief sought by the SEC.  In addition to entering injunctive relief, the Consent Judgments also provide a mechanism for resolving, by motion, the SEC's remaining claims for monetary relief.  As a result, the SEC has filed the instant motion for monetary relief—disgorgement, prejudgment interest, and civil penalties.[3]

Specifically, the Consent Judgments state that the Settling Defendants "shall pay … disgorgement of ill-gotten gains and pre-judgment interest thereon; [and] the amount of the disgorgement shall be determined by the court upon motion of the Commission[.]"  [*See, e.g.,* Memo. of Law in Supp. of Mot. for Award Against Settling Defs., Ex. 5 § VI, ECF No. 88-6.]  With respect to civil penalties, the Consent Judgments for Gasich and Luiten provide that "the Court shall determine whether a civil penalty … is appropriate and, if so, the amount of the penalty."  [*Id.*, Ex. 5 § VI; Ex. 7 § V.]  The Consent Judgment for Wilding and Skyline Capital, however, provides that they "shall pay … a civil penalty" in an amount "determined by the Court."  [*Id.*, Ex. 6 § III (emphasis added).]  The Consent Judgments further provide that, in connection with the SEC's motion: (a) the Settling Defendants are "precluded from arguing that they did not violate the federal securities laws as alleged in the Complaint" and (b) "the allegations of the Complaint shall be accepted as and deemed true by the Court."  [*Id.*]

Accordingly, the only issues remaining for the court to decide with respect to the Settling Defendants are the amounts of disgorgement, prejudgment interest and civil penalties to be

---

[2] Individual Consents signed by the Settling Defendants: Gasich and Market Ideas [ECF No. 4-1]; Wilding and Skyline Capital [ECF No. 8.]; Luiten [ECF No. 26.].

[3] Consent Judgments by the Settling Defendants: Gasich and Market Ideas [ECF No. 11.]; Wilding and Skyline Capital [ECF No. 12]; Luiten [ECF No. 32].

imposed. In making this determination, the court will accept as true the allegations in the Complaint.

The SEC has also filed its motion for monetary relief against Defendants Martino and Dalmy. On September 30, 2015, in separate orders, the Court granted the SEC's partial motions for summary judgment against Defendants Martino [9/30/15 Order, ECF No. 85] and Dalmy [9/30/15 Order, ECF No. 84]. The SEC alleges that Martino and Dalmy were participants in the "pump-and-dump" scheme involving the stock of Zenergy. In its September 30, 2015 orders, the court held Dalmy, a securities lawyer, liable for violating the registration requirements of Section 5 of the Securities Act of 1933 ("Securities Act"), both by selling her own Zenergy stock and by writing false attorney opinion letters, which enabled numerous other scheme participants to sell their Zenergy stock. In a separate order, the court also found Martino liable for violating Section 17(b) of the Securities Act by failing to disclose the compensation he was promised or received for publicly touting Zenergy's stock.

The SEC now seeks an Order imposing remedies for the violations of Martino and Dalmy and for entry of final judgment. Specifically, the SEC requests an Order (1) holding Martino and Dalmy liable for disgorgement of their ill-gotten gains; (2) awarding prejudgment interest; and (3) imposing civil penalties. In addition to monetary relief, the SEC also seeks to permanently enjoin Martino and Dalmy from engaging in conduct that violates the federal securities laws and also seeks to bar Martino and Dalmy from penny stocks. Despite the fact that Martino did not settle with the SEC, he did not respond to the SEC's motion for remedies and final judgment. Accordingly, there is no evidence to rebut the claims SEC for monetary and injunctive as to Martino. *S.E.C. v. Cook*, 2015 WL 5022152, at *27 (S.D. Ind. Aug. 24, 2015) ("We note that [Defendant] has interposed no response or other objection to the SEC's request for permanent

injunction."). Dalmy, however, has responded to the SEC's motion for monetary and injunctive relief.

## II. THE SEC'S COMPLAINT

As noted, the facts of this case are more thoroughly laid out in this court's September 30, 2015 Order granting partial summary judgment in favor of the SEC against Dalmy. Therefore, the court will assume familiarity with the facts. However, in the interest of identifying each of the parties at issue in this order, the court will briefly recite the facts as laid out in the Complaint. Zenergy was founded by Gasich, Luiten, and a third person who died before the events giving rise to this case. [Complaint, ¶¶ 20, 21, ECF No. 1.] Luiten was Zenergy's Chairman and CEO and managed its day-to-day operations. Gasich, however, participated in the management of Zenergy as a controlling shareholder and pursuant to consulting agreements. Luiten and Gasich were the only two individuals operating Zenergy. [*Id*.] According to the SEC, Zenergy had no revenue or income, nor any assets of consequence and it did not observe corporate formalities. [*Id.* ¶ 22.]

In late 2008, Zenergy decided to merge with a publicly traded shell entity to access publicly traded stock. [*Id*. ¶ 24.] In early 2009, Gasich identified Paradigm for this purpose. [*Id*.] At the time, Paradigm purported to be in the unrelated business of selling handheld metal detectors and had no operations or assets. [*Id*. ¶ 25.] Gasich handled the merger negotiations for Zenergy, and Wilding negotiated for Paradigm. [*Id*. ¶ 26.] Wilding, a stock promoter, was previously ordered by the SEC to cease and desist from violating the federal securities laws prohibiting the sale of unregistered securities. [*Id*. ¶ 14.] Zenergy and Paradigm entered into a share exchange agreement, where by Zenergy would be merged into Paradigm. Through this "reverse merger," Zenergy's shareholders assumed control of Paradigm. [*Id*. ¶ 32.]

In connection with the reverse merger, Gasich, together with Wilding and others, planned to distribute 300 million shares of purportedly unrestricted stock to Gasich's family and friends, promoters and touters, and associates of Paradigm. [*Id.* ¶ 34.] As partial consideration for the merger, Paradigm agreed to assume $30,000 of convertible debt purportedly owed by Zenergy. [*Id.* ¶ 35.] Gasich agreed to assign portions of the debt, which the assignees would then convert into shares to be sold in connection with a promotional campaign. [*Id.* ¶ 36.]

To memorialize the supposed convertible debt, Gasich prepared a backdated convertible note. [*Id.* ¶ 37.] On May 17, 2009, pursuant to Gasich's request, Defendant Diane Dalmy sent Gasich a template for a "standard convertible note." [*Id.*] On May 27, 2009, Gasich returned to Dalmy an executed note that followed Dalmy's template. [*Id.*] Days after the share exchange agreement was signed, Gasich assigned portions of the convertible debt to his family and friends, promoters, associates of Paradigm, and Dalmy, all of whom immediately exercised the option to convert the debt into shares of Paradigm stock. [*Id.* ¶ 39.] From June 19 to 23, 2009, Paradigm—Zenergy's predecessor entity—issued 300 million shares to Gasich's assignees. [*Id.* ¶ 40.] Wilding, through his company Skyline Capital, received 38 million shares. [*Id.*] The Zenergy stock received by Gasich's assignees was designated as restricted and could not be freely sold to the public. [*Id.* ¶ 134.] To get the restriction removed, Dalmy prepared and submitted to transfer agents numerous attorney opinion letters that falsely represented that the assignees' Zenergy stock, including her own shares, could be reissued and sold without restriction pursuant to Rule 144 under the Securities Act. [*Id.* ¶¶ 137-54.]

From June 2009 to August 2009, Zenergy and Paradigm issued a number of press releases designed to generate interest in Zenergy securities. [*Id.* ¶ 47.] These press releases were initiated by Gasich, who reviewed, edited, approved, and distributed them. [*Id.* ¶ 48.] Luiten

also reviewed and approved all or nearly all of the press releases. [*Id*.] In several of these press releases, Gasich and Luiten misrepresented or omitted material facts about Zenergy. [*Id*. ¶ 49.]

In early September 2009, OTC Markets (formerly Pink OTC Markets Group, Inc.) identified Zenergy's securities with a caveat emptor label and blocked quotations of Zenergy until Zenergy submitted a disclosure statement containing information about its ownership, operations, and financial condition. [*Id*. ¶ 81.] On or about September 15, 2009, Zenergy posted to the OTC Markets website an information and disclosure statement (the "Statement"). [*Id*. ¶ 82.] The Statement was drafted, reviewed, and approved by Luiten and Gasich. [*Id*. ¶ 83.] Zenergy's Statement contained numerous misstatements and omissions. [*Id*. ¶ 84.] Among other things, the Statement misrepresented or omitted to disclose material information about the control of Zenergy, as well as its operations and assets. Because the Statement did not contain any financial statements, OTC Markets refused to change or remove the caveat emptor label. Accordingly, on or about October 21, 2009, Zenergy posted financial statements dated September 30, 2009 as a supplement to the Statement. [*Id*. ¶ 92.] These financial statements were prepared and approved by Gasich and Luiten. [*Id.* ¶ 93.] The financial statements, however, contained several materially false statements and omissions designed to give Zenergy the appearance of legitimacy. [*Id.* ¶¶ 94, 95.] After the financial statements were posted on the OTC Markets website, OTC Markets removed the caveat emptor label and replaced it with a "limited information" emblem. [*Id.* ¶ 100.]

With the removal of the caveat emptor label, Gasich and Luiten caused Zenergy to issue another series releases designed to inflate the price of Zenergy's stock. Gasich also coordinated waves of touting activity in connection with Zenergy's press releases. Wilding retained a

number of touters, including Ronald Martino, to publicly promote Zenergy in emails, on message boards, and newsletters.

In total, the Gasich assignees and their transferees obtained trading profits of approximately $4.4 million of their sales of the assigned shares into the public market. [*Id.* ¶ 155.] No registration statement was filed or in effect for any of the transactions during the relevant time period. As detailed below, the Settling Defendants, Martino, and Dalmy profited from this illegal scheme.

### III. THE SEC'S REQUEST FOR RELIEF

#### A. Disgorgement and Prejudgment Interest

The SEC seeks disgorgement and an assessment of prejudgment interest from the Settling Defendants, Martino, and Dalmy. As noted, the Settling Defendants and Martino have interposed no specific response or objection to the SEC's request for disgorgement and prejudgment interest.

"Disgorgement is a form of restitution." *SEC v. Lipson*, 278 F.3d 656, 662–63 (7th Cir. 2002). The authority of a federal court to order disgorgement in an SEC enforcement action is well-established. *See, e.g., SEC v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229–30 (D.C. Cir. 1989). Courts have broad discretion in determining whether to order disgorgement, and in calculating the amount of disgorgement. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996). The amount ordered need only be a "reasonable approximation" of profits "causally connected" to the wrongdoing. *Patel*, 61 F.3d at 139. Any risk of uncertainty in calculating disgorgement falls on the defendants whose conduct created the uncertainty. *See Id.* at 140.

The court agrees with the SEC that the Settling Defendants, Martino, and Dalmy must be required to disgorge the ill-gotten gains of their fraud, to wit, the amounts they made selling Zenergy shares on the open market and to private investors while misrepresenting the company. No hearing is necessary before deciding this issue because the existing record is sufficient to permit an accurate calculation of this amount, plus prejudgment interest thereon. *See, e.g., United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989) (hearing on damages unnecessary if figure can be ascertained from definite figures contained in the documentary evidence or in detailed affidavits); *Shavers*, 2014 WL 4652121, at *10–11 (ordering disgorgement without a hearing based on summary judgment record). The declaration of the SEC's staff accountant, Timothy T. Tatman, supports a calculation of the amount of disgorgement and prejudgment interest, without necessity of an evidentiary hearing. [*See* Memo. of Law in Supp. of Mot. for Award Against Settling Defs., Tatman Declaration, Ex. 11, ECF No. 88-12; Memo of Law in Supp. of Mot. for Award Against Martino and Dalmy, Tatman Declaration, Ex. 16, ECF No. 90-17.]

Courts have "wide discretion" in awarding prejudgment interest, which helps assure that defendants do not profit from their fraud. *SEC v. Lauer*, 478 Fed. Appx. 550, 557 (11th Cir. 2012); *see SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) ("Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations."). Prejudgment interest is appropriate on disgorgement amounts based on the IRS underpayment rate. *SEC v. Koenig*, 532 F.Supp.2d 987, 995 (N.D. Ill. 2007). The prejudgment interest figures cited below were calculated in accordance with the delinquent tax rate established by the IRS, 26 U.S.C. § 6621(a)(2), and were assessed on a quarterly basis, following the date of each defendants' last receipt of ill-gotten gains.

The court therefore orders, based on the undisputed evidence[4] and the IRS underpayment rate, the following:

- Bosko R. Gasich disgorge, jointly and severally with Market Ideas, the amount of $633,518 in profits, and $79,732.37 in prejudgment interest, derived from the sales of Zenergy stock. [Complaint ¶ 159, ECF No. 1; Tatman Declaration ¶¶ 7, 8, Ex. 11, ECF No. 88-12.]

- Scott H. Wilding disgorge, jointly and severally with Skyline Capital, the amount of $1,331,365 in profits, and $192,778,45 in prejudgment interest, derived from the sales of Zenergy stock. [Complaint ¶ 155, ECF No. 1; Tatman Declaration ¶ 10, Ex. 11, ECF No. 88-12.]

- Robert Luiten disgorge the amount of $11,800 in profits and $1,709.51 in prejudgment interest from the sales of Zenergy stock. [Tatman Declaration ¶¶ 11, 12, Ex. 11, ECF No. 88-12.]

- Ronald Martino disgorge the amount of $22,993 in profits and $4,428.78 in prejudgment interest from the sales of and payment for touting Zenergy stock. [Tatman Declaration ¶¶ 9, 10, Ex. 16, ECF No. 90-17.]

- Dalmy disgorge the amount of $43,995 in profits and $9,877.11 in prejudgment interest from the sales of Zenergy stock. [Tatman Declaration ¶ 8, Ex. 16, ECF No. 90-17.]

**B. Civil Penalties**

The SEC requests that the Court also impose substantial civil penalties against the Settling Defendants, Martino, and Dalmy. As with the disgorgement and prejudgment interest requests by the SEC, the Settling Defendants and Martino did not respond to this request for imposition of a civil penalty. Dalmy filed a response in opposition to the SEC's motion and

---

[4] Dalmy does not object to the disgorgement of $43,995 but does object to the prejudgment interest amount of $9,877.11. Dalmy claims that prejudgment interest is not justified because she "kept the sale proceeds in an account since 2010" where the "funds have remained earning almost no interest rate," and that she did not spend the funds. [Dalmy Resp., p. 13, ECF No. 99.] However, Dalmy admits in her response to the SEC's Rule 56.1 Statement of Facts that she used the Zenergy stock sale proceeds for her personal expenses. [Memo of Law in Supp. of Mot. for Award Against Martino and Dalmy, Ex. 3, ¶ 80, ECF No. 90-4.] Further, the purportedly low interest earned in Dalmy's account is not supported by any evidence. Therefore, the court will rely on the SEC's prejudgment interest calculations.

requests that the court impose a penalty no greater than $7,500, the maximum tier one penalty, as described below.

The Securities and Exchange Act authorizes district courts to award a civil penalty in SEC enforcement cases. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). A civil penalty serves to punish and deter wrongdoers because disgorgement "does not result in any actual economic penalty or act as financial disincentive to engage in securities fraud." *SEC v. Moran*, 944 F.Supp. 286, 296 (S.D. N.Y. 1996) (quoting H.R.Rep. No. 101–616 (1990)).

The Securities and Exchange Act creates three penalty "tiers" based on a defendant's culpability and the extent of the harm resulting from the violation. 15 U.S.C. §§ 77t(d), 78u(d)(3). Tier one penalties are limited to $7,500 for a natural person or the gross amount of the pecuniary gain. Second tier penalties are limited to $75,000 for a natural person or the gross amount of the pecuniary gain and are appropriate in case of "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. The third (and highest) tier is reserved for conduct that (1) involves fraud, deceit, or manipulation, and (2) resulted in substantial losses (or created a risk of such losses) to others. *Id.* §§ 78u(d)(3)(B)(iii). For natural persons, the maximum third-tier penalty for "each such violation" during the relevant time is set at the greater of $150,000 or the "gross amount of pecuniary gain" to such person. *Id.*; 17 C.F.R. § 201.1004. With regard to gross pecuniary gain, "many courts have imposed a single penalty equal to the amount of disgorgement." *See SEC v. Graulich*, 2013 WL 3146862, at *7 (D. N.J. June 19, 2013) (citing cases). The exact amount of the penalty is for the Court's discretion. *See*, *e.g.*, 15 U.S.C. § 78u(d)(3)(B)(i) (stating that the court shall determine the amount of penalties "in light of the facts and circumstances").

In determining what the penalties should be, the court should consider the following: (1) the seriousness of the violations; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) whether the defendant has admitted wrongdoing; (5) the losses or risk of losses caused by the conduct; (6) any cooperation provided to enforcement authorities; and (7) ability to pay. *See SEC v. Rooney*, 2014 WL 3500301, at *3 (N.D. Ill. July 14, 2014); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050-51 (S.D. Ind. 2005).

Following the statutory language, courts have assessed penalties on a per violation basis, such that each separate instance of misconduct factors in the computation of the dollar amount of the fine. *See, e.g., SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009) (court found 18 violations of same regulation and imposed penalty of 18 times the statutory penalty amount); *SEC v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) (court calculated penalty by multiplying number of misrepresentations by statutory penalty amount); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (court assessed third-tier penalty of $1.2 million by multiplying maximum statutory penalty amount ($100,000 at the time) by number of defrauded investors (twelve)).

Courts also have exercised their discretion to impose penalties in amounts equal to the gross pecuniary gain of the defendant(s). *See, e.g., SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 371 (D.R.I. 2011) (court found multiple statutory violations and imposed penalty equal to pecuniary gain of nearly $1.8 million); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y 2007) (court imposed penalty equal to $15 million of ill-gotten gains); *SEC v. Invest Better 2001*, 2005 WL 2385452, at *5 (S.D.N.Y. May 4, 2005) (ordering civil penalty equal to disgorgement amount because number of violations difficult to determine).

    **i.**    **Gasich**

The SEC requests that substantial penalties be imposed on Gasich because of his "egregious" conduct. Gasich, along with Wilding, orchestrated and implemented the pump-and-dump scheme that defrauded innocent investors out of more than $4 million. The SEC has offered evidence that Gasich assisted in drafting and issuing numerous false press releases designed to inflate the price of Zenergy's largely worthless stock, which he and his assignees then dumped on innocent investors. The SEC argues that Gasich's conduct was fraudulent, deceitful, and manipulative, and resulted in Gasich's gain of more than $600,000. [Tatman Declaration ¶¶ 7, Ex. 11, ECF No. 88-12.] Further, the SEC has sufficiently proven that Gasich acted with scienter and that his scheme spanned over six months, involved numerous illegal acts, and resulted in multiple violations of federal securities laws. Moreover, there is no evidence of Gasich's inability to pay a civil penalty.

Although not explicitly argued in its motion, the allegations in the SEC's memorandum and the legal authority cited therein direct the court to impose a third-tier civil penalty. The court finds that a penalty equal to the gross amount of gain—$633,518—is appropriate. *SEC v. Seven Palm Investments, LLC*, 2014 WL 1292377, at *3 (N.D. Ill. Mar. 31, 2014) (Finding that a third-tier penalty was justified based on the egregious nature of Defendant's actions and the fact that Defendant was the "central player" in the misconduct and profited in a large way.")

### ii. Wilding and Skyline Capital[5]

Along with Gasich, Wilding played a key role in the scheme that defrauded investors of over $4 million. This is underscored by the fact that Wilding profited more than anyone from the fraud. Gasich and Wilding were the driving forces behind the reverse merger between Zenergy and Paradigm that gave birth to the fraudulent scheme. In addition, Wilding helped Gasich

---

[5] The Consent Judgment entered against Wilding and Skyline Capital provides they "shall pay, *jointly and severally*," disgorgement, prejudgment interest, and a civil penalty. [*See* Memo. of Law in Supp. of Mot. for Award Against Settling Defs., Consent Judgment, Ex. 6, ECF No. 88-7 (emphasis added).]

coordinate the promotional campaign that artificially inflated the price of Zenergy's stock, in part by hiring all of the touters who published glowing (and false) posts about Zenergy's stock. The SEC has also submitted evidence that Wilding acted with scienter, is an experienced stock promoter, and has previously been sanctioned by the SEC for participating in unregistered offerings. The SEC states that Wilding is a recidivist securities violator who not only violated Section 5 of the Securities Act, but also violated the SEC's prior cease-and-desist order. [*See* Memo. of Law in Supp. of Mot. for Award Against Settling Defs., p. 18, ECF No. 88.] Like Gasich, the SEC argues that Wilding is deserving of "the most severe civil penalty" the court will permit. [*Id.*] For the same reasons detailed above, the court finds that a civil penalty equaling Wilding's gross amount of gain—$1,331,365—is appropriate. This is especially true given Wilding's repeated violations of the Securities Act and of the SEC's prior cease-and-desist order. A severe penalty is required in order to both punish and deter Wilding (and others) from engaging in these acts in the future.

   iii. **Luiten**

Although Luiten is a founder of Zenergy, the record demonstrates that his activities in furthering the scheme and his profits from the scheme are far less than his cohorts. Nevertheless, Luiten reviewed and approved Zenergy's false press releases and false disclosure statement. Luiten's actions, and inactions as corporate officer and director of Zenergy, contributed to the losses suffered by investors. Therefore, the court finds that a tier one penalty of $7,500 is appropriate.

   iv. **Martino**

The unrefuted evidence submitted by the SEC demonstrates that Martino touted Zenergy stock on message boards with the intention of driving up the company's stock. Martino did so

without disclosing that he was being compensated for his touting activities. Moreover, Martino lied to the SEC regarding the number of posts he made during the relevant time period. Although he claimed to have made only three posts, Martino in fact posted dozens of times. Under the circumstances, the court finds that a civil penalty equaling his ill-gotten gains of $22,993 is appropriate.

### v. Dalmy

The SEC argues that Dalmy is a "pervasive offender" who, in this case alone, committed at least eleven separate violations of the securities laws. Dalmy, on the other hand, argues that her "only transgression was opining incorrectly that the shares at issue did not need registration. The public does not need protection from that." [Dalmy Resp. in Opp. p. 9, ECF No. 99.]

As noted in its order on September 15, 2016, the court is unaccustomed to deciding issues like scienter and good faith without a hearing. Therefore, the court reserves ruling on the SEC's motion for civil penalties against Dalmy until a hearing on the matter is conducted. A status hearing is set for September 28, 2016 at 9:30 a.m. in order to schedule an evidentiary hearing to resolve this issue.

### C. Permanent Injunction

The Securities and Exchange Act authorizes district courts to grant injunctive relief in SEC enforcement cases. 15 U.S.C. §§ 77t(b), 78u(d). Permanent injunctions are "primarily intended to protect the investing public from future misconduct." *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984). To obtain permanent injunctive relief once a violation has been demonstrated, the SEC "need only show that there is a reasonable likelihood of future violations." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). Courts must assess the totality of the circumstances in determining the likelihood of future violations, and should consider: (1)

the gravity of harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Id.*

Injunctive relief against Martino is appropriate here.[6] The violations that occurred in the instant case are not minor. Moreover, Martino fails to recognize the gravity of his misconduct. It is clear that Martino lied under oath regarding the extent of his touting activities. A permanent injunction prohibiting Martino from future violations of federal securities laws is appropriate here, especially considering the possibility, indeed, the likelihood of future violations. *Cook*, 2015 WL 5022152 at *27 (citing *Shavers*, 2014 WL 4652121 at *10).

Like the civil penalty that the SEC seeks against Dalmy, this issue will be resolved once a hearing is conducted.

**D. Penny Stock Bar**

The Securities and Exchange Act also authorizes district courts to impose a penny-stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock." 15 U.S.C. §§ 77t(g), 78u(d)(6). A "penny stock" is an equity security bearing a price of less than five dollars except as provided in 17 C.F.R. § 240.3a51–1. The SEC represents that the Zenergy stock meets the definition of "penny stock" under those provisions and the Defendants offer no response.

The factors for a penny stock bar are similar to those for an injunction. In determining whether a defendant should be permanently enjoined for violations of the securities laws, courts consider a number of non-exclusive, interrelated factors, which include: (1) the "egregiousness"

---

[6] Again, the court notes that Martino has not responded to the SEC's motion.

of the underlying securities law violation; (2) whether the defendant is a "repeat offender"; (3) the defendant's role or position when he engaged in the securities law violation; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the reasonable likelihood that misconduct will recur. *SEC v. Benger*, 64 F.Supp.3d 1136, 1138-39 (N.D. Ill. 2014) (citing *S.E.C. v. Patel*, 61 F.3d 137, 141 (2nd Cir. 1995)). For the reasons stated above, the court finds that a penny stock bar is appropriate for Martino. Again, the court reserves ruling on a penny stock bar against Dalmy until after a hearing is conducted.

### IV. CONCLUSION

For the reasons stated above, the SEC's motions for award of remedies and entry of final judgments [87] [89] are granted in part. A status hearing is scheduled for September 28, 2016 in order to set an evidentiary hearing regarding Dalmy's scienter.

Date: September 20, 2016 /s/
Joan B. Gottschall
United States District Judge