UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 13-cv-5511 ) ) Judge Joan B. Gottschall |
| ZENERGY INTERNATIONAL, INC., *et al.*, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The Securities and Exchange Commission ("SEC") brought this enforcement under Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act"), 48 Stat. 74, as amended, 15 U.S.C. § 77t(b) and (d), and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d) and § 78(e) against several defendants, including attorney Diane D. Dalmy ("Dalmy"). The SEC alleges that the defendants perpetrated a so-called "pump and dump" scheme. Remaining for decision are portions of the SEC's request for remedies. An important inquiry is whether Dalmy acted in bad faith and with scienter. For the following reasons, the court finds that she did and imposes appropriate civil penalties and a permanent injunction.

## I. BACKGROUND

### A. Facts and Dalmy's Liability

On September 30, 2015, the court entered partial summary judgment finding Dalmy "liable for selling unregistered securities in violation of Section 5." *SEC v. Zenergy Int'l, Inc. (Zenergy I),* 141 F. Supp. 3d 846, 855 (N.D. Ill. 2015), available at ECF No. 84. The undisputed

facts of the scheme are set forth in detail in that opinion and subsequent opinions. *See Zenergy I,* 141 F. Supp. 3d at 847-51; *SEC v. Zenergy Int'l, Inc. (Zenergy II),* 2016 WL 5080423, at *2–4 (N.D. Ill. Sept. 20, 2016).

In brief, Dalmy acted as the transaction attorney for a reverse merger in which Zenergy acquired the publicly traded stock of Paradigm Tactical Products, Inc. ("Paradigm"). *See Zenergy I,* 141 F. Supp. 3d at 849-50. As part of the merger, Bosko R. Gasich ("Gasich") assigned convertible debt securities to Dalmy, his friends, family members, and business associates, who converted the securities to Zenergy shares and sold those shares after the merger to the tune of at least $4.4 million. *See id.* at 850-51.

Dalmy wrote several letters opining that the converted shares were exempt from the registration requirements of Section 5 of the Securities Act. *Id.* at 851. She received stock as payment for her services and used one of her opinion letters to sell that stock, netting approximately $40,000. *See id.* Dalmy maintained that she and the other individuals to whom she issued opinion letters fell within the exemption to Section 5's registration requirements "for transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1).

The court ruled that the exemption did not apply because Gasich underwrote the reverse merger in which Dalmy received her stock. *See Zenergy I,* 141 F. Supp. 3d at 853–55. At issue was whether Gasich qualified as an underwriter. *Id.* at 853. Reviewing the applicable statutory and regulatory definitions, the court explained that the undisputed evidence showed that Zenergy was under Gasich's control, and so Dalmy had to wait a year to sell stock she received from him before invoking the safe harbor of 17 C.F.R. § 230.144, commonly referred to as Rule 144. *See id.* at 853–55. Accordingly, Dalmy and Gasich's sales of Zenergy stock violated the registration requirements of § 5 of the Securities Act. *Id.* at 855. The court noted that Dalmy

"acknowledge[d] that Gasich assisted her in drafting the documents necessary to effectuate the transaction. In Dalmy's own words, 'Gasich had significant involvement' in the negotiations on behalf of Zenergy." *Id.* (citing Dalmy's Resp. to SEC's SOF ¶ 46).

### B. <u>The Parties Agree to Rely on Dalmy's Video Deposition</u>

Following the entry of summary judgment on liability, the SEC moved for entry of final judgment awarding civil penalties and injunctive relief against Dalmy and other defendants. On September 20, 2016, the court, among other things, ordered Dalmy to disgorge $43,995 in profits and $9,877.11 in prejudgment interest. *Zenergy II*, 2016 WL 5080423, at *9. The court reserved ruling on the SEC's requests for civil monetary penalties and injunctive relief against Dalmy, however. *Id.* at 14, 15. The court contemplated holding a hearing before ruling on those requests:

> The SEC argues that Dalmy is a "pervasive offender" who, in this case alone, committed at least eleven separate violations of the securities laws. Dalmy, on the other hand, argues that her "only transgression was opining incorrectly that the shares at issue did not need registration. The public does not need protection from that." [Dalmy Resp. in Opp. 9, ECF No. 99.]
>
> As noted in its order on September 15, 2016, the court is unaccustomed to deciding issues like scienter and good faith without a hearing. Therefore, the court reserves ruling on the SEC's motion for civil penalties against Dalmy until a hearing on the matter is conducted. A status hearing is set for September 28, 2016 at 9:30 a.m. in order to schedule an evidentiary hearing to resolve this issue.

*Id.* at *7.

Dalmy declined the court's invitation for an in-person hearing.[1] She argued that holding such a hearing would impose an "undue burden" because publicity surrounding this case and

---
[1] The SEC did as well, initially arguing that collateral estoppel barred Dalmy from relitigating scienter. The parties briefed the collateral estoppel issue, and the court denied the SEC's motion to apply collateral estoppel on June 22, 2017, Order 11–15, ECF No. 120. The court authorized the SEC to refile any motion to invoke collateral estoppel

related administrative actions left her with little discretionary income to support herself and her daughter. Mem. dated Oct. 15, 2016, at 3, ECF No. 112. Also, holding an in-person hearing "would add little significant value" according to Dalmy because the evidentiary record is extensive and the parties have briefed the issues extensively. *Id.*

Because Dalmy claimed an undue hardship, the court suggested an alternative to an evidentiary hearing:

> The scienter question left to decide depends in large part on determining how much weight to give Dalmy's testimony and what inferences to draw from it. The SEC and Dalmy rely heavily, but not exclusively, on excerpts of Dalmy's deposition taken June 10, 2014, ECF No. 90-2, to convince the court to draw contradictory inferences concerning scienter and what Dalmy knew when she wrote the opinion letters made the subject of this suit. *Compare* ECF No. 90 at 10-12 (citing Dalmy's deposition transcript to establish knowledge), *with* ECF No. 99 at 3-4. The deposition transcript communicates none of the information about Dalmy's demeanor, body language, and tone of voice on which credibility findings depend.

Order at 3, ECF No. 123 (Aug. 2, 2017). The court suggested that it "could assess Dalmy's credibility by watching the recording." *Id.* at 4. The parties conferred and agreed to the proposal. They have jointly designated portions of the video deposition they consider relevant to the questions before the court. ECF No. 127.

### C. **The Connecticut and Colorado Cases**

Before the court ruled on the designations, the SEC filed two motions asking the court to take judicial notice of Dalmy's guilty plea and other papers filed in in a criminal case against Dalmy in the United States District Court for the District of Connecticut, *United States v. Dalmy*, No. 3:18-CR-21 (JAM) (D. Conn.) ("Connecticut case"). Both motions to take judicial notice were granted. *See* Fed. R. Evid. 201. ECF Nos. 138, 143. The court ordered the SEC to file a

---

within 28 days, *id.* at 15, but the SEC did not refile the motion. Consequently, collateral estoppel is no longer an issue. Order dated Aug. 2, 2017, at 2, ECF No. 123.

4

memorandum explaining what evidentiary weight should be given to the noticed documents. The SEC did so. ECF No. 144. The deadline set by the court for Dalmy to file a response has passed, and she has not filed anything.[2] *See* ECF No. 145.

*1. The Connecticut Case*

Dalmy pleaded guilty in the Connecticut case to conspiracy to commit wire fraud. 18 U.S.C. §§ 1343, 371. She stipulated to a fact statement as part of her written plea agreement. Plea Agreement, Feb. 6, 2018, Ex. A, ECF No. 136-1 at 11–14. Dalmy admitted to participating in another pump and dump scheme between January 2009 and July 2016. *Id.* at 11. She wrote "fraudulent opinion letters," permitted others to write such letters in her name, and "ghost wrote" opinion letters in another attorney's name. *Id.* at 11, 12. Dalmy also stipulated that she provided capital for the scheme and assisted with laundering a portion of the proceeds. *Id.* The letters were materially false "as to whether the issuing company was a shell company, whether the [shareholder] was an affiliate of the issuer, whether the transactions described in the letters actually had occurred, and whether the defendant had performed the due diligence that she described in the letters." *Id.* at 12.

The court in the Connecticut case sentenced Dalmy to serve three years in prison and pay restitution of $2 million. Judgment 1, May 15, 2018, ECF No. 140-1 Ex. A. Dalmy was re-sentenced, however, because the court found that she willfully failed to pay restitution. *See* 18 U.S.C. §§ 3572(h), 3614(a). Based on evidence submitted by the government, the court found that Dalmy "squirreled . . . away" tens of thousands of dollars in cash in a rented storage unit. Order at 5, Nov. 6, 2018, ECF No. 140-1 Ex. C. Among the court's findings, "Dalmy

---

[2] Despite Dalmy's criminal conviction, discussed in the text below, the court has no reason to think that the attorney representing her in this civil action has ceased to represent her. No motion to withdraw has been filed. *See* N.D. Ill. L.R. 83.17 ("The attorney of record may not withdraw, nor may any other attorney file an appearance on behalf of the same party or as a substitute for the attorney of record, without first obtaining leave of court . . . .").

acted with knowledge and willful intent to evade her restitution obligations." *Id.* Dalmy argued that she was unaware that she had to pay restitution immediately instead of after her release from prison. *Id.* The court found her argument disingenuous because it had specifically admonished her both at sentencing hearing and in the criminal judgment that restitution was due immediately. *Id.* The Connecticut court increased Dalmy's sentence to the statutory maximum of five years. Am. Judgment 1, Dec. 7, 2018, ECF No. 140-1 Ex. D.

*2. The Colorado Case*

The SEC filed a civil enforcement action in the United States District Court for the District of Colorado ("Colorado case") on March 13, 2019. *See* Compl., *SEC v. Dalmy*, No. 1:19- cv-745 (D. Colo.), available at ECF No. 140-1 Ex. E. The complaint accuses Dalmy of attempting to evade a 2016 administrative order barring her from practicing before the SEC. *See id.* ¶¶ 14–16. Dalmy allegedly filed "materially false and misleading" attorney opinion letters, and other documents, with the SEC under another lawyer's signature. *See id.* ¶¶ 3, 23–35. This court also takes judicial notice of the entry of a default judgment in the Colorado case on December 2, 2019. Order & Default Judgment, *SEC v. Dalmy*, No. 19-CV-745, ECF No. 43 (D. Colo. Dec. 2, 2019). Dalmy advised the SEC that she intended to default, thereby admitting to the well-pleaded facts alleged in the SEC's complaint. *Id.* at 1 n.1 (citing *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016)) (other citations omitted). Dalmy therefore admitted the following facts (among others):

> Between 2014 and 2016, Ms. Dalmy prepared at least 85 legal opinions letters concerning more than 25 issuing companies. But, because she was on the list of prohibited attorneys, Ms. Dalmy engaged Defendant Michael J. Woodford, also an attorney in Colorado, to sign his name to her opinion letters. Mr. Woodford did nothing more substantive than sign his name or check for trivial errors. Most of these letters concerned stock issued by microcap companies whose securities were traded on the over-the-counter market. Most of the letters expressed the opinion that certain shares of stock held by certain individuals were unrestricted and could be freely traded on the open market. These letters were then sent to transfer agents

and brokerage firms; thus, the shareholders in question were able to sell their shares to the public.

Defendants' venture did not stop in 2016. Ms. Dalmy continued to prepare various legal opinions letters concerning certain companies and, whether, for example, certain shares were exempt from any registration requirement. And, Mr. Woodford continued to sign off on them as if he had conducted the due diligence and prepared the letters.

*Id.* at 2.

The court in the Colorado case awarded permanent injunctive relief. The injunction: (1) bars Dalmy from further violations of federal securities laws; (2) requires her to comply with the SEC's administrative orders barring her from practicing before it; and (3) prohibits Dalmy from "providing professional legal services in connection with the offer or sale of securities and requiring her to provide any client seeking legal representation on such matter" with copies of the papers on which the injunction is based. *Id.* at 8–9. The court also ordered Dalmy to disgorge $26,700 in ill-gotten gains and to pay a civil monetary penalty of $86,718. *Id.* at 9–12.

## II. MOOTNESS

The recently issued permanent injunction in the Colorado case raises a threshold mootness question. "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). In accordance with this principle, a request for a permanent injunction generally becomes moot when another court awards effectively identical relief. *See Asset Allocation and Mgmt. Co. v. W. Employers Ins. Co.*, 892 F.2d 566, 573 (7th Cir. 1989); *Corgain v. Miller*, 708 F.2d 1241, 1247 (7th Cir. 1983); *Madyun v. Thompson*, 657 F.2d 868, 871-72 (7th Cir. 1981); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999); *Marshel v. AFW Fabric Corp.*, 552 F.2d 471, 472 (2d Cir. 1977); *see also* 13B *Wright, Miller, et al.*, Federal Practice & Procedure § 3533.2

7

(West Supp. 2019).

The SEC seeks two forms of permanent injunctive relief here. Mem. Supp. Mot. for Remedies 13–14, ECF No. 90. One duplicates permanent injunctive relief awarded by the Colorado court—a prohibition against violating federal securities laws.[3] The SEC's request for an identical injunction here is therefore moot. However, the Colorado court's injunction does not bar Dalmy from trading in penny stocks. *See* Order & Default Judgment 13–14, *SEC v. Dalmy*, No. 19-CV-745, ECF No. 43 (D. Colo. Dec. 2, 2019). Accordingly, the SEC's request for that relief remains live here.

### III.  GOVERNING LAW

The Securities and Exchange Act authorizes comprehensive remedies in enforcement actions, including the remedies at issue: awarding civil penalties, *see* 15 U.S.C. §§ 77t(d), 78u(d)(3), and imposing a penny-stock bar "against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock." 15 U.S.C. §§ 77t(g), 78u(d)(6). *See generally Kokesh v. SEC*, 137 S. Ct. 1635, 1642 (2017). There is no dispute that Dalmy participated in an offering of penny stock. Most of the arguments concern the degree to which she acted in good faith.

Courts consider a number of non-exhaustive factors to decide whether and to what degree to impose both remedies. For a penny-stock bar, the factors considered are similar to those considered when deciding whether to enjoin the defendant permanently from violating the securities laws: "(1) the 'egregiousness' of the underlying securities law violation; (2) whether the defendant is a 'repeat offender'; (3) the defendant's role or position when he engaged in the

---

[3] Dalmy's time to appeal the Colorado court's default judgment has not run. Mootness has not been briefed here. If any party believes that this court should decide the SEC's request for an injunction preventing Dalmy from violating federal securities laws, counsel should advise the court promptly—and before entry of judgment.

securities law violation; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the reasonable likelihood that misconduct will recur." *Zenergy II*, 2016 WL 5080423, at \*8 (citing *SEC v. Benger*, 64 F. Supp. 3d 1136, 1138-39 (N.D. Ill. 2014)). The *Zenergy II* opinion set forth the framework for civil monetary penalties:

> The Securities and Exchange Act creates three penalty "tiers" based on a defendant's culpability and the extent of the harm resulting from the violation. In determining what the penalties should be, the court should consider the following: (1) the seriousness of the violations; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) whether the defendant has admitted wrongdoing; (5) the losses or risk of losses caused by the conduct; (6) any cooperation provided to enforcement authorities; and (7) ability to pay. *See SEC v. Rooney*, 2014 WL 3500301, at \*3 (N.D. Ill. July 14, 2014); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050-51 (S.D. Ind. 2005).
>
> Following the statutory language, courts have assessed penalties on a per violation basis, such that each separate instance of misconduct factors in the computation of the dollar amount of the fine. *See, e.g., SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009) (court found 18 violations of same regulation and imposed penalty of 18 times the statutory penalty amount); *SEC v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) (court calculated penalty by multiplying number of misrepresentations by statutory penalty amount); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (court assessed third-tier penalty of $1.2 million by multiplying maximum statutory penalty amount ($100,000 at the time) by number of defrauded investors (twelve)).
>
> Courts also have exercised their discretion to impose penalties in amounts equal to the gross pecuniary gain of the defendant(s). *See, e.g., SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 371 (D.R.I. 2011) (court found multiple statutory violations and imposed penalty equal to pecuniary gain of nearly $1.8 million); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (court imposed penalty equal to $15 million of ill-gotten gains); *SEC v. Invest Better 2001*, 2005 WL 2385452, at \*5 (S.D.N.Y. May 4, 2005) (ordering civil penalty equal to disgorgement amount because number of violations difficult to determine).

*Id.* at \*6–7.

## IV. ANALYSIS

Rather than mechanically considering the factors, the court cuts to the crux of Dalmy's arguments. Dalmy contends in effect that Gasich and others masterminded the scheme. She

9

testified at her deposition that she acted in good faith at all times, and she argues that she had no knowledge of the pump and dump scheme, that she reasonably believed Gasich did not control Zenergy, and that her failure to detect the scheme and Gasich's indirect control of Zenergy was "at most negligent." Resp to Mot. for Remedies 2–5, ECF No. 99; *see also* Dalmy Dep. Tr. (July 22, 2011) 125:18-23, ECF No. 76-6. If she was incorrect about whether Gasich was a Zenergy affiliate when she issued her opinion letters, Dalmy asserts that "it is because he mislead [sic] her." Resp to Mot. for Remedies 3.

### A. The SEC Did Not Concede Good Faith

Dalmy first makes a legal argument, albeit without citing legal authority. *See* Resp. to Mot. for Remedies 5, 6. She contends that the SEC implicitly conceded that she did not act in bad faith when it charged her with a § 5 violation rather than the fraud-based charges leveled against other defendants here. As stated at summary judgment on Dalmy's liability, a § 5 violation requires proof that the defendant directly or indirectly sold unregistered securities using interstate facilities or the mails. *Zenergy I*, 141 F. Supp. 3d at 852 (citing *SEC v. Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill. 1999)). For the indirect sales involved here (Dalmy also made direct sales), a defendant must substantially participate in the sale. *Id.* (citing *SEC v. Greenstone Holdings, Inc.,* 2012 WL 1038570, at *11 (S.D.N.Y. March 28, 2012)). Dalmy maintains that scienter is not an element of a § 5 violation, but she cites no legal authority in support of that proposition. Resp. to Mot. for Remedies 5, 6.

The court need not, and so does not, decide whether scienter is an element of a § 5 violation[4] because Dalmy conflates liability with remedies. The liability and remedies

---

[4] This court's brief research has located no Seventh Circuit authority on whether § 5 requires scienter. The closest Seventh Circuit case the court has found concerned a defendant who violated a preliminary injunction prohibiting the unlawful sale of unregistered securities, essentially a § 5 violation. The district court held the defendant in contempt of the preliminary injunction, so the scienter requirement for civil contempt applied. *SEC v. McNamee*,

provisions of the securities laws generally operate independently; the provisions authorizing injunctive relief do not modify the scienter requirements for a particular violation. *See Aaron v. SEC*, 446 U.S. 680, 703 (1980). Consistent with this principle, "a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief" regardless of whether scienter is required to prove the particular violation. *Id.* at 701. The summary judgment opinion established Dalmy's liability for § 5 violations. *Zenergy I*, 141 F. Supp. 3d at 852. Because remedies questions remain, this court must weigh all of the relevant factors, including bad faith and scienter. *See id.*; cases cited in Part II *supra*.

**B. Dalmy Did Not Act in Good Faith**

In their briefing, the SEC and Dalmy rely primarily on Dalmy's deposition testimony and competing inferences from email messages sent around the time Dalmy wrote the opinion letters at issue in 2009. After considering this evidence, the court finds Dalmy's claims of good faith incredible in light of the objective evidence of her involvement in the scheme and facts that should have alerted an experienced securities lawyer like Dalmy to the extent of Gasich's interest in Zenergy.

As an initial matter, the video recording of Dalmy's deposition has been of little assistance. Even as it suggested using the deposition (after the parties had declined the court's invitations to hold a hearing), the court cited case law discussing the perils of attempting to detect lies based on such factors as a witness's demeanor, body language, and tone of voice.

---

481 F.3d 451, 455–56 (7th Cir. 2007). The D.C. Circuit has not decided whether scienter is an element of a § 5 violation. *Zacharias v. SEC*, 569 F.3d 458, 469 (D.C. Cir. 2009) (per curiam). At least the Second and Eighth Circuits have held that scienter is not required for a § 5 violation. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976); *Feeney v. SEC*, 564 F.2d 260, 262 (8th Cir. 1977).

Order at 3 (citing, among other cases, *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)). People, including judges, make poor lie detectors when trying to read these sorts of cues. The Seventh Circuit has recognized as much. "Demeanor evidence, such as tone of voice, or gestures or posture, can be an unreliable clue to truthfulness or untruthfulness, and thus distract a trier of fact from the cognitive content of a witness's testimony." *United States v. Pickering*, 794 F.3d 802, 805 (7th Cir. 2015) (collecting research, including *Demeanor*, 76 Cornell L. Rev. 1075 (1991)).

Dalmy's video deposition has proven no more helpful than the cold pages of the transcript. "[A]ll findings of fact, including those based on credibility, must be supported by substantial evidence." *NLRB v. Cutting, Inc.*, 701 F.2d 659, 663 (7th Cir. 1983) (citations omitted). Considered on its own, Dalmy's video deposition does not get this court off of dead center. Dalmy's answers to many questions ultimately strike the court as opaque. Her tone and nonverbal cues may result from fatigue with the long deposition or fatigue with the enforcement process itself. She may be trying to cover something up, or her sometimes monotone responses may be truthful for all the court can tell.

Seeing live testimony can be of significant value to a fact finder by providing a forum for testing what a witness says against sound logical principles and the objective evidence. *See Pickering*, 794 F.3d at 805; *Carradine*, 360 F.3d at 754. This is why the court repeatedly expressed its preference for an in-person hearing. Having been refused, the court tests Dalmy's testimony against the email messages and other exhibits in the record.

To reiterate, Dalmy argues and testified that Gasich fooled her despite her due diligence, but she fails to explain why she took Gasich's word over contradictory emails and why she failed to conduct a reasonable investigation. She testified that she believed Gasich's assurances that he

did not qualify as a Zenergy affiliate; she thought he was a consultant for the transaction. Dalmy Dep. Tr. (July 22, 2011) 125–26, ECF No. 76-6.

"[D]eliberate ignorance" satisfies the scienter requirement of the securities laws. *SEC v. Jakubowski*, 150 F.3d 675, 681–82 (7th Cir. 1998) (citing *United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986)); *see also City of Livonia Emps' Ret. Sys. and Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 761 (7th Cir. 2013) (applying deliberate ignorance principles when asking whether lawyer acted in good faith); *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) ("When the facts known to a person place [her] on notice of a risk, [she] cannot ignore the facts and plead ignorance of the risk.") (citation omitted); *SEC v. Kelly*, 545 F. Supp. 2d 808, 811–12 (N.D. Ill. 2008). The court finds that at best Dalmy took steps to remain deliberately ignorant of Gasich's affiliation with Zenergy.

Dalmy offers no satisfactory explanation, either in her briefing or at her depositions, for her failure to verify Gasich's affiliate status through readily available objective sources. Dalmy does not dispute that she received an email message approximately a month before she began writing the opinion letters at issue. ECF No. 90-4 ¶ 48; Summ. J. Ex. 63 (emails dated May 17, 2009), ECF No. 66-8. The message, which is from Gasich, stated that Gasich was a "10% plus" owner of Zenergy. Summ. J. Ex. 63 at 1. That fact alone qualified him as a Zenergy affiliate, yet nowhere does Dalmy testify that she confronted Gasich with the contents of the message.

Additionally, Dalmy had access to, or could have requested, documents from which she could have discovered Gasich's interest in Zenergy. *See Zenergy I*, 141 F. Supp. 3d at 851 (describing Dalmy's role and functions performed as transaction attorney). Dalmy could not

recall at her deposition whether she reviewed a shareholder list, however.[5]  *See* Dalmy Dep. Tr. (July 22, 2011) 64:5-8, ECF No. 76-6.  There is, therefore, no evidence that she performed even this basic due diligence, and if she did, she turned a blind eye for fear of what she would see.

Why take Gasich's word given these red flags and the readily available documents?  The only explanation that makes any sense is that Dalmy had something to gain.  And she did.  Dalmy accepted Zenergy stock as compensation for her legal services.  Resp. to Mot. for Remedies 12.  Dalmy represents that this was an isolated incident.  *Id.*  Whatever the ethical and legal implications, the fact that Dalmy had a personal financial stake in the transaction makes her claim that Gasich duped her further suspect by supplying a motive to bury her head in the proverbial sand.

Dalmy's failure to verify Gasich's interest in Zenergy stands in marked contrast to other matters on which she conducted due diligence.  Dalmy points to an email message in which she expressed her concerns about oral representations made to her by the CEO of Paradigm Partners ("Paradigm"), another company involved in the transaction.  *See* ECF No. 99-4 Ex. D at 2.  The CEO said that Paradigm was not a shell company, but Dalmy's email betrays her healthy skepticism.  *See id.*  As Dalmy stated, she had a "concern" about Paradigm's status, but if Paradigm was not a shell, "[w]e are fine."  *Id.*  She did not evince comparable skepticism about Gasich, however.  *See id.*  The court finds that the message shows that Dalmy knew that she should not take statements made by those involved in the transaction at face value when drafting opinion letters.  *See id.*  The fact that she did so with Gasich further undermines Dalmy's protestations of good faith.

---

[5] Dalmy cites this portion of her deposition for the proposition that she conducted due diligence on the shareholder list.  Read in context, Dalmy testified that she did not recall anything more than seeing a shareholder list, but she did not testify why she consulted it or indicate whether Gasich appeared on it.

14

The documents of which the court has taken judicial notice in the Connecticut case and in the Colorado case further support the court's findings. Because Dalmy has put her state of mind at issue, the court considers this evidence to prove Dalmy's intent, knowledge, and absence of mistake. Fed. R. Evid. 404(b)(2).

In particular, and in the absence of counterargument from Dalmy, Dalmy's admissions in the Connecticut case further bolster the court's findings on bad faith, scienter, and related matters. The scheme underlying the Connecticut case occurred during the same period of time as the events of this case. Dalmy admitted to conspiring to write false opinion letters. The letters, she stipulated, were materially false on matters similar to the letters at issue here, namely "whether the shareholder was an affiliate of the issuer . . . , and whether [Dalmy] had performed the due diligence that she described in the letters." Plea Agreement 13, Feb. 6, 2018, Ex. A, ECF No. 136-1.

Nowhere in Dalmy's depositions does she even suggest that she took steps to verify Gasich's claims not to be a Zenergy affiliate by consulting independent evidence.[6] Her claims that she did not know of Gasich's convertible debt interests in Zenergy are not credible. Scott Wilding ("Wilding") sent Dalmy an email on June 7, 2009, asking whether "Bob Gasich's debt conversion" was "bullet proof" and whether "we legally need to go into any type of consulting agreement with [B]ob [G]asich . . . ." ECF No. 99 Ex. D at 2. The court finds that as the transaction attorney, Dalmy should have followed up on this and the other red flags discussed in the foregoing paragraphs. Given all of these failings and Dalmy's decision not to testify before

---

[6] Dalmy testified at one point that she conducted unspecified research on Zenergy and Paradigm, but the evidence of that research was destroyed in a flood in her home. To believe this testimony, one would have to believe that her research on Zenergy and Paradigm, unlike her other research, was limited to paper. The court finds this testimony incredible. Moreover, Dalmy did not testify that the research alerted her to Gasich's affiliate status or could have done so. *See* Dalmy Dep. Tr. (June 10, 2014) 18:20-21:4, ECF No 90-2.

15

this court and offer a sufficient explanation, the court finds that she, at least, deliberately closed her eyes to avoid learning of Gasich's interest in the Zenergy transaction. *See Jakubowski*, 150 F.3d at 652.

Worse, the court finds Gasich's email dated July 1, 2009, denying affiliate status to be evidence that Dalmy was attempting to create a paper trail to cover her tracks. *See id.* at 682 (lawyer who took steps "to cover his trail" had "intent to deceive"). The email says in one sentence that Gasich is not a Zenergy control person or affiliate. Email dated July 1, 2019, at 1, ECF No. 99-2 Ex. B. Dalmy testified that she asked Gasich to write it, but she did not explain her reasoning.

In sum, the court finds that Dalmy acted with a relatively high degree of bad faith and scienter at a level exceeding deliberate ignorance and exacerbated by the fact that she stood to profit from the sale of Zenergy stock.

### C. <u>Determination of Remedies and Penalties</u>

After weighing all the factors listed in Part III, the court imposes a penny stock ban and a tier two penalty. Taken in conjunction with the other Part III factors and the evidence discussed above, the Rule 404(b) evidence shows Dalmy to be a repeat offender even while this enforcement action was pending. Dalmy's efforts to secrete funds even after the Connecticut court sentence further persuade this court that a penny-stock ban is required to deter Dalmy from further violations. Dalmy's repeated falsification of opinion letters and ghostwriting of documents to be filed with the SEC after she was banned from practicing are not the acts of a person who has taken responsibility for her violations. Instead, in the last two years, Dalmy flouted a court order to pay restitution in the Connecticut case and the SEC's order barring her

16

from practicing. All of this occurred while this suit was pending. The court therefore finds that there is far more than a reasonable possibility that Dalmy's violations will recur.

For essentially the same reasons, the court imposes a penalty upon Dalmy equal to twice her ill-gotten gains. Dalmy displayed some candor and cooperation when she sat for depositions in 2011 and 2014. But that evidence of her cooperation is dwarfed by the evidence that she continues to minimize her role int the violations here. *See SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019) ("the civil penalty's main design is to deter [violations in the first place], not to encourage whistleblowing and cooperation after the fact."). The Connecticut court's findings that she attempted to conceal cash from her victims indicate further that Dalmy has not been cooperative or forthright and does not appreciate the gravity of her violations.

While it might be possible to infer that Dalmy and Gasich worked together to accomplish the pump-and-dump scheme, the record is insufficient to find that Dalmy's role is comparable to Gasich's. Due to their central roles in the scheme, Gasich and Scott H. Wilding ("Wilding") received a tier three penalty. *Zenergy II*, 2016 WL 5080423, at *6, 7. Robert J. Luiten ("Luiten"), a comparatively minor player, received a tier one penalty, and the court ordered Ronald Martino ("Martino") to pay a penalty equal to his ill-gotten gains. *Id.* at *7.

Dalmy's level of culpability lies in between. Similar to Dalmy, Martino promoted Zenergy stock to the public without revealing that he stood to gain from an increase in its value. *Id.* He used public message boards. *Id.* Dalmy lent the legitimacy of attorney's opinion letters to the scheme. Considering Dalmy's abuse of her position and all of the circumstances here, the court assesses a penalty of twice Dalmy's ill-gotten gains, approximately $88,000 in all. *See Williky*, 942 F.3d at 393–94; *Drucker v. SEC*, 346 F. App'x 663, 666 (2d Cir. 2009).

17

## V. CONCLUSION

For the reasons stated:

1. The request for a permanent injunction barring Dalmy from violating the securities laws is denied as moot.

2. The request for a penny-stock bar is granted.

3. A civil penalty of $88,000 is imposed.

Date:   December 20, 2019 /s/
Joan B. Gottschall
United States District Judge